[Crim. No. 7477. Third Dist. May 28, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
QUI MEI LEE, Defendant and Appellant.

## COUNSEL

James M. Gavin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Eddie T. Keller and Carol Hogan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARAS, J.**—A jury convicted defendant of violation of subdivision 1 of section 424 of the Penal Code (misappropriation of public funds), and violation of subdivision (a) of section 19405 of the Revenue and Taxation Code (making a false state income tax return). She was acquitted of another tax charge contained in a third count. She was granted probation and appeals.

### FACTS

Viewed in the light most favorable to the prosecution (*People* v. *Crowe* (1973) 8 Cal.3d 815, 833-834 [106 Cal.Rptr. 369, 506 P.2d 193]), the evidence relevant to this appeal is as follows:[1]

As Medical Director of San Joaquin County, Dr. Louis M. Barber was in charge of all county medical facilities. In such capacity, he was empowered to approve all invoices for medical and laboratory services provided to the county by private physicians and laboratories. Upon Barber's approval, those invoices were automatically paid by the county auditor. On behalf of the county's medical facilities, Barber also received state warrants and certain county warrants drawn upon the account of the local health district. These warrants represented payments to the county facilities for fulfillment of valid contracts to provide medical services to the local health district and the state. Upon their receipt, Barber was required to transfer such local health district and state payments to the accounts of the payee county facilities designated on the warrants.

---

[1]Notwithstanding that the issues on this appeal call for only a brief summary of the evidence, we have carefully reviewed the reporter's trial transcript (which comprises nearly 1600 typewritten pages) so that we might fairly assess the prejudicial impact of the alleged prosecutorial misconduct asserted in defendant's second and third contentions, *infra.*

Over a long period of time, however, Barber pursued a bizarre scheme. He forged and approved false invoices to the county for medical and related services ostensibly provided by private practitioners and laboratories. In payment of those invoices, the county auditor routinely issued warrants payable to the supposed providers of services. Barber also established a checking account for a bogus "Research Fund," into which he deposited the state and local health district payments.

Although Barber was not tried with defendant (see fn. 3, *infra*), defendant was prosecuted as an aider and abettor of Barber. Between 1968 and 1972, while employed as Barber's secretary, defendant rented post office boxes and an apartment in the names of the doctors and laboratories appearing on the fake invoices. Those addresses were used as mail drops for the receipt of county payments on the fraudulent invoices, as were other addresses, including Barber's office and defendant's home and post office box. The names of two physicians on the post office box applications were forged by defendant. From the mail drops, she collected county warrants mailed there in payment of the forged invoices, and delivered the warrants to Barber. Some of the forged invoices were prepared on a typewriter found in defendant's home during a search by the police.

Upon Barber's instructions, defendant deposited the county warrants into various banks. She forged a bank signature card in opening one of those accounts, and opened other accounts in the names of the warrant payees. Barber forged the endorsements of the payees on most of the deposited warrants, and defendant's signature was affixed as a second endorsement. On occasion defendant deposited warrants by herself forging the payee's name. Checks drawn by Barber on the Research Fund also were deposited into those accounts. Defendant regularly wrote checks on one of the bank accounts (unknown to Barber, her personal account) to pay Barber's bills when he gave her lists of creditors for that purpose. She also cashed some of the warrants. Barber paid her $150 per month for those services, over and above her salary as a secretary.

Although defendant admitted that she had aided Barber as aforesaid, her defense was that she was an extremely obedient, unquestioning employee, who gave no thought to what her employer told her to do; that she was unaware that Barber was misappropriating county funds; and that she did not profit from her activities. (See generally, *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; 1 Witkin, Cal. Crimes (1963) Defenses, § 155, pp. 149-150.)

I

## Defendant's Liability as an Aider and Abettor

■ Defendant contends that the undisputed facts show that Barber, as the principal, was not properly chargeable under subdivision 1 of section 424 of the Penal Code, and hence that defendant could not be validly charged and convicted as an aider and abettor in that offense. (See generally, Pen. Code, § 31; *People* v. *Allsip* (1969) 268 Cal.App.2d 830 [74 Cal.Rptr. 550]; *Ex parte Sullivan* (1911) 17 Cal.App. 278 [119 P. 526].) The contention is without merit. It rests on defendant's erroneous interpretation of *People* v. *Knott* (1940) 15 Cal.2d 628 [104 P.2d 33, 128 A.L.R. 1367], and *People* v. *Dillon* (1926) 199 Cal. 1 [248 P. 230].

Subdivision 1 of section 424, provides: "Each officer of this state, or of any county, city, town, or district of this state, and every other person *charged with the receipt, safekeeping, transfer, or disbursement of public moneys,* who . . . . [¶] 1. Without authority of law, *appropriates* the same, or any portion thereof, to his own use, or to the use of another; . . . [¶] Is punishable by imprisonment in the state prison for not less than one or more than 10 years, and is disqualified from holding any office in this state." (Italics added.) Whereas subdivision 1 refers to the *misappropriation* of public moneys, other subdivisions of section 424 address themselves to such misconduct as the making of unauthorized loans and profits from public moneys, the keeping of false accounts concerning such funds, and the willful refusal to pay them over upon proper demand.

*People* v. *Knott, supra,* was a prosecution under section 504 of the Penal Code, which provides in relevant part: "Every officer of this State, or of any county, city, city and county, or other municipal corporation or subdivision thereof . . . who *fraudulently appropriates* to any use or purpose not in the due and lawful execution of his trust, any property which he has *in his possession or under his control* by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."[2] (Italics added.)

In *Knott,* the defendant county auditor contended that she did not have any county money in her possession or under her control within the meaning of section 504 inasmuch as the county treasurer was the officer

---

[2] Fraudulent intent is not an element of a section 424 violation but is an essential part of a section 504 offense. (*People* v. *Holtzendorff* (1960) 177 Cal.App.2d 788, 794-796 [2 Cal.Rptr. 676].)

charged by statute with the receipt and disbursement of such funds. The court in part rejected the contention and held that the auditor had control of public moneys, since she had authority to issue warrants payable by the treasurer and thus exercised direction and management as to their disbursement. (15 Cal.2d at p. 631.) In so holding, the court said, "Section 504 of the Penal Code clearly indicates that it is complementary to section 424 of the code which denounces . . . *certain specified acts, described with considerable particularity,* by state and other officers handling public money. The statute under which appellant was prosecuted has a *much more restricted application, being limited to the appropriation of public money,* but it includes not only those having possession of it but also any person who has control of such funds." (15 Cal.2d at pp. 631-632.) (Italics added.)

Defendant seizes upon the above quotation from *Knott* and argues that it means that a county officer can be prosecuted under section 504 if he has either possession or control of public funds, but that such officer is not properly chargeable under section 424 unless he has possession of those funds—as distinguished from mere control thereof. Defendant's interpretation of *Knott* is unwarranted. All the court was saying in *Knott* was that, in contrast to the many different types of misconduct (including misappropriation) proscribed by various subdivisions of section 424, only the act of fraudulent misappropriation is proscribed by section 504—a comparison which is self-evident upon the face of the sections. *Knott* did not say that section 424 is inapplicable to county officers whose duties do not include the actual possession of public funds.

Defendant's reliance upon *People* v. *Dillon, supra,* 199 Cal. 1, is similarly unavailing. As defendant points out, *Dillon* states that "section 424 has to do solely with the receipt, safekeeping, transfer, and disbursement of *public moneys* by official custodians." (*Id.* at p. 10) That statement furnishes defendant no support. The court was merely paraphrasing the first paragraph of section 424 for the purpose of emphasizing that section 424 is limited to the single subject of "public moneys" whereas section 504 broadly embraces "any property. . . ."

Indeed, the *Dillon* case refutes defendant's argument that, within the meaning of section 424, a public officer is not "charged with the receipt, safekeeping, transfer, or disbursement of public moneys" if his duties merely include control thereof as distinguished from possession. Speaking of section 424, the *Dillon* court said, "It is clear that said section has to do solely with the protection and safekeeping of public moneys . . .

and with the duties of the public officer charged with its custody *or control . . . .*" (199 Cal. at p. 5.) (Italics added.) The court stressed that section 424 was "enacted in obedience to the express mandate" of section 17, article XI, of the state Constitution of 1879, which provided that "[t]he making of profit out of county, city, town, or other public money, or using the same for any purpose not authorized by law, by any officer having the possession *or control* thereof, shall be a felony, and shall be prosecuted and punished as prescribed by law." (*Id.* at pp. 5-7.) (Italics transposed.) The court further noted in *Dillon* that the mere fact that the defendant might have been prosecuted under the more general statute, section 504, was no bar to his being prosecuted under the more specific provisions of section 424. *(Ibid.)*

No express language in section 424 restricts its application to cases where the public officer's duties include the possession of public funds. The history of section 424, as reviewed in the *Dillon* case, leaves no doubt that the section was also intended to cover instances where the officer was merely charged with the duty of controlling such funds.

Through his approval of the invoices, and through his receipt of the local health district and state payments which he was obligated to transfer to the accounts of the county medical facility payees, Barber controlled "the receipt, safe-keeping, transfer, or disbursement of public moneys" as required for section 424 to apply. (Cf. *People* v. *Dillon, supra,* at p. 4; *People* v. *Holtzendorff* (1960) 177 Cal.App.2d 788, 801 [2 Cal.Rptr. 676]; *People* v. *Schoeller* (1950) 96 Cal.App.2d 55, 56-59 [214 P.2d 572].) Within the meaning of section 424, it was not necessary that Barber be "charged" with those duties *by statute.* (See *People* v. *Schoeller, supra,* at pp. 56-58.) The undisputed evidence, and defendant's stipulations at trial, left no doubt that Barber appropriated those moneys to his own use (§ 424, subd. 1). Hence, contrary to defendant's contention, Barber was properly chargeable under subdivision 1 of section 424.[3]

## II

### CROSS-EXAMINATION OF CHARACTER WITNESS[4]

Defendant next contends that the prosecutor engaged in prejudicial misconduct during his cross-examination of one of defendant's

---

[3]Indeed, we judicially notice that Barber pleaded guilty to a violation of section 424 for his role in the embezzlement scheme.

[4]This portion of the opinion is the only part which meets the criteria for publication in the official reports. (Rule 976 (b), Cal. Rules of Court.) Regrettably, the entire opinion

character· witnesses; Dr. Eccleston. Dr. Eccleston testified on direct examination that defendant's reputation for truth and honesty in the community where she lived and worked was and is above reproach. He also in effect gave his personal opinion that defendant was and is honest. Upon cross-examination, the prosecutor interrogated the witness as follows:

"Q. Now, Dr. Eccleston, I'm going to ask you a series of questions and it's just about what you may have heard about the defendant. Okay?

"A. Uh-huh (yes).

"Q. All right. Have you heard that she forged a certain doctor's name on many county warrants?

"A. No.

"Q. Okay. Have you heard that she deposited checks in other doctors' names in her own accounts?

"A. I have read that in the paper.

"Q. Okay. Have you heard that she forged post office box applications and bank applications?

"A. Nothing of that nature.

"Q. Have you heard that she was receiving $150 a month for doing this which was not reported to the income tax authorities?

"A. I read something in the paper to that effect, but I don't even know the details as compared with the question.

"Q. Okay. Okay. Did you take into consideration then in your opinion as to her truth and honesty?

"A. Yes, I have.

"Q. Did you take into consideration, when I asked you whether or not you had heard about her forging certain names, is that correct?

must be nonetheless published. (See *People* v. *Collins* (1975) 44 Cal.App.3d 617, 623 [118 Cal.Rptr. 864].)

"A. Well, only as I would say the reading in the paper. I don't even remember the details, as detailed by you in your question, except the question sounds familiar.

"Q. So you could not have taken that into consideration in forming your opinion, isn't that true, sir?

"A. No—what was that?

"Q. Well, I believe that you indicated that you had not heard that the defendant had forged a certain doctor, or a certain Dr. E. Patrick Quinn's name on many county warrants, is that correct?

"A. No, I'm not familiar with that.

"MR. BOSCOE [defense counsel]: Just a minute, doctor.

"THE COURT: Just a minute.

"MR. BOSCOE: At this time, for the purpose of the record, I assign all of those questions of counsel as reversible error and misconduct on his part, and he knows better than that. He is attributing—

"MR. VAN OSS [prosecutor]: Your Honor, I have a list of citations here I will give the Court.

"THE COURT: Let Mr. Boscoe finish.

"MR. BOSCOE: For the purpose of my record, he is asking this witness for specific items of misconduct. And he has no right to do that. All he has to do, he has an obligation only to cross-examine the witness on the question of what the reputation is in reference to the particular trait that is involved here, truth and honesty. [¶] Now he is asking questions in reference to the specific act, forging a name, unreported income tax, $150 a month, and fraudulently opening up mail boxes. That's all prejudicial error, to bring before the juror. And I will submit to Your Honor a case, and plenty of authority that that is misconduct on the part of the District Attorney. And I ask the Court now to admonish the jury to disregard those questions that have been asked of this witness."

Defense counsel's objection was then taken up outside the presence of the jury, after which the court, referring the jurors to the objection,

admonished them as follows: "I wish to advise the jurors that relating to the matter that was before the Court just before the noon recess, the jurors are directed to disregard any statements of counsel made in connection with the law that might be applicable to the question before the Court at the time. You must keep in mind that statements of counsel are not evidence in this matter, and you as jurors are only to consider the evidence that you hear from a witness who testifies on the witness stand.

"Please keep that in mind now, that you are to disregard any statements made by counsel unless they stipulate to something, which they have been doing frequently throughout the course of the trial. Anything they stipulate to you consider as evidence. These other comments that counsel might have made, of course, is not evidence in the matter. And it has been, as a result of our discussion, I don't believe it's necessary to recall Dr. Eccleston at this time."

"It is, of course, within the ambit of proper cross-examination of a character witness to inquire, in good faith, whether the witness has heard of specific misconduct of the defendant inconsistent with the trait of character testified to on direct [citations]." (*People* v. *Marsh* (1962) 58 Cal.2d 732, 745 [26 Cal.Rptr. 300, 376 P.2d, 300].) No reported California case, however, has decided whether (as defendant contends) it is improper for a defense character witness to be asked on cross-examination if he has heard that the defendant committed the act or acts *for which he is on trial*.[5] Out-of-state authorities are not uniform on the subject, some permitting such interrogation, while others hold that such cross-examination must be confined to acts antecedent to the offense for which the defendant is on trial. (See Note 47 A.L.R.2d 1258, 1303-1306.)

For the reasons hereinafter set forth, we hold that the cross-examination was proper. ■ Section 1102 of the Evidence Code allows a defendant in a criminal action to offer opinion evidence of his character or a trait of his character to prove his conduct in conformity with such character or trait of character. The defendant's reputation in that regard may similarly be offered. The character or character trait must, of course, be relevant to the offense charged. (See Evid. Code, § 1102, Cal. Law Rev. Com. comment.)

The character witness may give his opinion or his knowledge of the defendant's reputation either (1) as of the time of and prior to the alleged

---

[5] *People* v. *Kramer* (1968) 259 Cal.App.2d 452 [66 Cal.Rptr. 638], and *People* v. *Buchel* (1956) 141 Cal.App.2d 91 [296 P.2d 113], which are relied upon respectively by the People and defendant, were not decided upon the point here in issue.

offense, or (2) as was done here, as of the time of testifying. Section 1102 of the Evidence Code does not contain a time limitation. The time frame used on direct examination determines the extent of the cross-examination. If Dr. Eccleston had testified that as of the time of the alleged offenses (or even as of the time preceding his awareness thereof), defendant was honest or had a good reputation for honesty, any cross-examination regarding his having heard of the charged offense would exceed the scope of the direct examination and thus be improper. Such question could in no way test the credibility of the witness as to the subject matter of his direct testimony. Having testified that the defendant's reputation for honesty was good as of the time of or preceding the charged offense, whatever adverse comment he might have heard thereafter, including reports of the charged offense, could not possibly cast any doubt upon the integrity of such past opinion.

Quite another result obtains however where, as here, the witness' testimony is delivered in the present tense. No one can seriously maintain that a character witness comes into a criminal trial unaware that the defendant is charged with a crime. Obviously he knows this. Obviously too, no person publicly charged with a crime such as misappropriation of public funds can have an unquestioned *present reputation* for honesty. Whatever his reputation might have been before the charge, after the charge it is at least dubious. Thus where the character witness nonetheless states under oath that such defendant's reputation for honesty is presently good, there is a strong suggestion (to say the least) that he is not a credible witness. And on cross-examination, such lack of credibility may be demonstrated by asking him whether he in fact has heard of the commission of the offense for which the defendant is on trial. Such a question is highly relevant, and therefore proper. (Evid. Code, § 351.) Similarly, if the character witness gives his *personal opinion that the defendant is presently honest, the same* question on cross-examination is most relevant; for if he has heard of the offense charged, the validity of his opinion may be affected thereby.

Defense counsel can avoid the problem by limiting the scope of inquiry on direct examination. By initially directing questions of a character witness to the time of and reasonably prior to the alleged offense, defense counsel averts what is otherwise proper, and potentially damaging cross-examination. A further consequence of direct examination of a character witness directed to the time of the offense is that in rebuttal, the prosecution may only offer contrary character evidence as of such time. (Evid. Code, § 1102, subd. (b).) If the defendant offers

character evidence directed to the time of trial, rebuttal evidence on the subject may be similarly directed.

■ In the instant case, because of the nature of the questioning on direct examination, the cross-examination was proper. Furthermore, even if "misconduct" (as that term is generally defined—see, e.g., *People v. Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]) had occurred, defendant could not have been prejudiced by the cross-examination of Dr. Eccleston. (*People v. Beivelman, supra,* p. 75; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The asserted vice of asking a character witness whether he has heard of specific acts of misconduct by the defendant is that it brings before the jury, through an indirect type of hearsay, rumors of such misconduct. (*People v. Marsh, supra,* p. 746.) In the instant case, long before Dr. Eccleston was cross-examined as to whether he had heard of the acts mentioned by the prosecutor, the prosecutor had already placed evidence of all those acts before the jury as integral parts of the People's case. (Cf., *People v. Marsh, supra,* p. 746.) The jury could not have thought otherwise than that the questions put to Dr. Eccleston on cross-examination merely referred to the same misconduct which the prosecutor was attempting to prove. Indeed, apart from claiming that the $150 payments mentioned by the prosecutor were for reimbursement of automobile expenses, defendant had already admitted to the jury all the acts later cited during the Eccleston cross-examination.

III

PROSECUTOR'S ARGUMENT TO JURY

Defendant contends that the prosecutor's opening argument to the jury constituted prejudicial misconduct in that the prosecutor therein characterized the evidence as showing that Dr. Barber had "realized," in October 1970, that defendant "was tapping him for a little bit more than he wanted her to."

Even if the prosecutor's characterization of what Dr. Barber had "realized" was not a reasonable inference from the evidence, the point does not warrant reversal. It was a matter of minor significance. Furthermore, the record shows that no objection was made by defendant when the prosecutor made substantially the same assertion at four earlier times during his opening argument. (See *People v. De Vries* (1921) 52 Cal.App. 705, 710 [199 P. 867].) Moreover, as previously mentioned, the

jury was repeatedly instructed that counsel's statements were not evidence.

Whether Dr. Barber had "realized" that defendant "was tapping him" was collateral to the central issue concerning defendant's having profited financially from Barber's misappropriations—an issue which went not only to defendant's motive for aiding and abetting Barber but also to the substance of the tax charges against defendant. There was substantial evidence that defendant had indeed tapped Barber's illicitly acquired funds, at least during 1970. Consequently, the prosecutor's argument could not have been prejudicial. (*People* v. *Beivelman, supra,* at p. 75; *People* v. *Watson, supra,* at p. 836.)

The judgment is affirmed.

Puglia, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied June 18, 1975, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1975.