[Crim. No. 26259. Second Dist., Div. Five. Jan. 21, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY SPERL, Defendant and Appellant.

## COUNSEL

Richard H. Levin for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HASTINGS, J.**—In a nonjury trial defendant Sperl, who was the Marshal for Los Angeles County, was convicted in count I of violating Penal Code section 424, subdivision 3, in that he had knowingly kept false accounts relating to the receipt, etc., of public moneys (Legislative Advocates transaction); in count III of violating section 424, subdivision 1, in that he misappropriated public moneys for the use of another (Candidate's Driver transaction); in count V of violating section 424, subdivision 3, in that he knowingly kept false accounts or made false entries or erasures in accounts relating to the receipt, etc. of public moneys (Marina Del Rey transaction); in count VII of violating Government Code section 6200 (theft, destruction, falsification, secretion or removal of public records by an officer custodian); and in count IX of violating Government Code section 31114, subdivision 3, a misdemeanor (furnishing special and secret information for the purpose of either improving or injuring the prospects of persons to be examined under a county civil service system.) Defendant's motions for an evidentiary hearing and for a new trial were argued and denied. As to counts I, III, V and VII, defendant was sentenced to the state prison for the term prescribed by law, execution of the sentence was suspended, and he was placed on probation for a period of four years, on certain terms and conditions, one thereof being that he spend the first six months in the county jail. As to count IX defendant was fined $500; however, payment of the fine and service of the county jail condition were ordered to be stayed pending appeal. Defendant Sperl has appealed from the judgment of conviction.

### Statement Of Facts

#### Count I—Legislative Advocates Transaction

Deputies Sewards, Vogts, and Marquez, Sergeant Johnson and Lieutenant Samuels testified that they were members of the Los Angeles County Marshal's Department. At various times during 1971 and 1972

defendant Sperl assigned them to the administrative bureau and placed them on special assignment as a legislative advocate representing the Los Angeles County Marshals Association, a private association. In that capacity they were assigned to duties in Sacramento where they would review legislation and make recommendations to the local legislative committee on matters that were of interest to their particular association. They were not acting on behalf of the Marshal's Department of Los Angeles County. As a legislative advocate they would be required to go to Sacramento from time to time, depending on the status of the legislation they were following. Their transportation to Sacramento and back, and their expenses for food and lodging while in Sacramento, were paid for by the association.[1] However, they continued to receive their normal pay check from the County of Los Angeles during the entire period of time they were acting as legislative advocates. The advocates would initial the monthly reports indicating they had worked the normal working hours. These reports were prepared by Natalie Scotton, defendant's administrative secretary. It was her responsibility to carry the time for the people assigned to the administrative bureau.

There was nothing in the monthly personnel rosters that would indicate that the deputies were doing anything other than working for the county. There was evidence that Natalie Scotton kept a system of double timekeeping books, "actual time" and "Sacramento time." The deputies understood that time earned for vacation and as compensatory overtime was being deducted in exchange for the time spent in Sacramento; however, all vacation time was "given back."

Captain Perkins was chairman of the legislative committee of the marshal's association for the fiscal years 1970-1971 and 1971-1972. In January 1972 defendant told him to keep accurate records of the amount of time the advocates were spending in Sacramento and that they were to go on their vacation time, overtime, or donated vacation time. However, Perkins understood from defendant that the time spent in Sacramento "should not be a sacrifice to their own personal vacation time; that time would be restored."

Perkins spoke with defendant about the sufficiency of overtime and vacation time of advocates to cover their activities in Sacramento. Perkins told defendant that the advocates wanted to take their own personal vacation time but there was "no time left" on the books.

---

[1] In 1974 the board of supervisors approved county payment of the legislative advocate's expenses in Sacramento.

Defendant told him to mark the men present when, in fact, they were not present.

Perkins further stated that he was present when defendant told Natalie Scotton to mark absent deputies as present or on overtime that was manufactured.

In late 1973 and early 1974, Captain Perkins, who had a background in accounting and bookkeeping, assisted in the grand jury inquiry and reconstructed time spent on legislative activities as to each advocate and carried a balance as to what was due the county or due to the advocate. He was assisted by Natalie Scotton and an auditor from the district attorney's office. His sources included Scotton's books, the monthly personnel reports, departmental absence reports, and overtime slips. A recap sheet introduced into evidence showed the loss to the county for advocate time spent in Sacramento. The total raw figure for all legislative advocates was $11,185.99 (People's Exhibit 1), and the total figure after giving credit for "questionable time" was approximately $5,024.

Natalie Scotton, defendant's administrative secretary, testified that in early 1972 defendant instructed her to show the advocates as absent on the days they were in Sacramento but to "work it" so that the advocates would not lose any of their own time. She was to keep a separate record as to the time these men were actually off on their own time and then to show them present for these days on the timesheet that went to the payroll office. When the deputies were in Sacramento, she showed them on vacation or overtime. When they were running out of vacation and overtime, she would then "manufacture" overtime by adding hours to their normal day.

### Count III—Candidate's Driver Transaction: Misappropriation of Public Monies

Gene Baraldi, deputy marshal for Los Angeles County, received instructions from defendant in January 1972 to pick up then Assemblyman Hayes whenever he received a call and to take him wherever he wanted to go. From the beginning of this special assignment in January until approximately May 5, 1972, Baraldi transported Hayes, his staff and his family in a county automobile. After May 5 and until August 29, 1972[2] he usually used Hayes' personal vehicle; however, he continued

---

[2] After August 29, 1972, when Hayes was appointed a Supervisor for Los Angeles County by the Governor, Baraldi was temporarily assigned to the board of supervisors where he worked as Hayes' aide and driver until the last of May 1973.

using the county vehicle to transport Hayes' staff and family. Whenever he was driving a county vehicle, the county paid his wages; when he was driving Hayes' personal car, he would take this time off his overtime. He reported the hours worked to Natalie Scotton. From his personal notebook and trip tickets Baraldi computed that his total salary prior to August 1972 for transporting Hayes, his family and staff amounted to $1,759.72[3]

Eddy Tanaka, chief analyst in the county administration office in 1972, testified that it was the county policy in August 1972 to escort dignitaries (state and federal legislators) if their activity directly related to county business.

### Count V—Marina Del Rey Deputies—Campaign Telephone Calls for a Candidate

In April of 1972 Cherry Povolock was working for Bishop and Associates, an advertising and public relations firm. During that month she coordinated a fund raising testimonial dinner for Hayes who was candidate for the office of county supervisor. For two to three weeks near the end of April there were two to five men on any given day from the marshal's office who were volunteering their time to make telephone calls.

Several men from the administrative division of the marshal's office testified that they worked on the Hayes dinner: Deputy Locke, approximately 8 days; Deputy Keenan, 5 to 10 days; Sgt. Hopton, 2 days; Deputy Davis, 7 days; Sgt. Tepas, 6 to 8 days; Lt. Hodgkins, 2 days; and Deputy Marquez, 2 half days. With the exception of Deputy Locke, each man understood that the time worked on the testimonial dinner was to be debited against his vacation or compensatory overtime. Deputy Locke did not know at the time how his time was being marked. Sgt. Hopton noticed later that his overtime did not decrease after his assignment.

Natalie Scotton kept the time records for the administrative division of the marshal's office during April and May of 1972. During the month of April she marked the above deputies present for the days that they actually worked on the dinner. In May or June defendant gave her a list showing these deputies and told her to get back the monthly time sheets

---

[3]Charles Hurd, deputy marshal for the county, testified that during July 1972, while Baraldi was on vacation, he transported many dignitaries in a county vehicle and on county time. He particularly transported Hayes, his staff and family, with some frequency.

from the payroll office to make certain changes. Defendant wanted these men shown as "off so that they do not lose any of their own time." He also wanted her to "destroy all the old documents" and to "[c]hange the records. Mark these people off and fix it so they don't lose any of their own time." She then proceeded to make the requested changes in both the time book and on the daily absence reports and the monthly time reports. If necessary, she added in overtime for March to cover the time spent for the dinner. The deputies did not work the overtime she added.

Captain Perkins testified that his computations showed that the total number of working hours spent at the marina for the telephoning was 440 and the loss to the county amounted to $2,994.24.

### Count VII—Candidate Driver Transaction— Radio Logs

Emil Lindquist, head of administrative services, marshal's department, testified that the radio logs and ledgers from the marshal's department are stored in the county archives. Under the marshal's Manual of Rules and Regulations the records generally are destroyed after five years.

In October 1973, James O'Connell, acting head of the county archives, received a letter from defendant authorizing certain members of the marshal's department access to the records from the marshal's department that were stored in the archives.

Frank Maas, supervisor of the records section of the archives, testified that in October 1973 Deputies Castaneda and Alexander, both of whom were from the marshal's office, told him they were interested in seeing communication records and radio logs. After obtaining the necessary authorization, Castaneda and Alexander, accompanied by one or two other individuals, withdrew certain records. Later about 20 boxes of records were returned; however, Maas did not know the contents of the boxes.

In October 1973, Sgt. Millard Johnson was working in traffic court in the marshal's department. During the week of October 11, he and Deputies George Rodriguez and Gene Baraldi went over to the Hall of Records to "pull . . . boxes." He learned from conversations with Baraldi and Rodriguez that the boxes contained radio logs.

After retrieving the boxes they took them to the basement of the Criminal Courts building where Johnson opened the boxes, took out folders and went through each stack one by one. Lieutenant Alexander told him to remove all logs that referred to trips to the airport. Johnson also thought that there might have been mention of removing logs pertaining to the transportation of a dignitary and to the marina. He spent until 5:30 or 6 p.m. doing so. Lieutenant Alexander and Baraldi also removed radio logs during this time.

Baraldi testified that on October 11, 1973, Castaneda told him to go to the archives and pull certain boxes. He complied with Rodriguez' and Johnson's help. Upon Lieutenant Alexander's instructions both Baraldi and Johnson removed radio logs pertaining to transportation of dignitaries, a fiesta or the marina, placed them in a brown envelope and gave them to the defendant at the end of the day. He returned the next day and continued to remove radio logs, along with Lieutenant Alexander, Captain Spencer and defendant. He was instructed by both Alexander and defendant to say that they were looking for missing radio logs if anyone caught them. At the end of the day he saw defendant place the envelope containing the pulled logs in his automobile.

On November 12, Baraldi was in Captain Spencer's office when Lieutenant Alexander came in and said, "We will have to get our stories together, if we're going to be called as witnesses in the district attorney's office." A meeting was arranged with defendant at a pancake house. Present were Captain Spencer, Lieutenant Alexander, defendant, and Baraldi. After discussions back and forth, Alexander and defendant decided to say that they were in the basement searching for missing radio logs. Defendant also made a statement to the fact that "this was a big political thing." Baraldi replied that if it was political "then it would be you and I that are involved," since Baraldi had been so close to Hayes. Defendant and Alexander also discussed making a report having to do with the searching of the missing radio logs. It was to be pre-dated and they agreed upon a date.

On November 15, Baraldi told Castaneda that he thought defendant should replace the files. Castaneda said he would talk to defendant. Later that day when Castaneda came to his office, Baraldi asked "What did the marshal say? Is he going to put the records back?" Castaneda replied, "No. They've been destroyed."

Baraldi assisted the district attorney in the reconstruction of the radio logs and it was determined that there were 299 missing radio logs in the group they searched.

William Ritner, Captain Perkins' personal attorney, testified that he met with Perkins and defendant during the week of November 12, 1973. During their conversation, Perkins asked about the trip tickets and defendant responded, in essence, that they had been found and "taken care of"; "don't worry about them."

*Count IX—Civil Service Board*

In January 1973 Kenneth Olsen, a lieutenant in the Pasadena Police Department, was designated as a rater for the civil service oral board for promotions to the position of sergeant in the marshal's department. On February 6, 1973, he attended a luncheon meeting with two other raters (Lieutenants Smith and Hughes), defendant and another member from the marshal's department. At the luncheon either defendant or his aide gave Olsen a file folder containing a ballpoint pen, a felt tip pen, cigarette lighter, pocket calendar instrument, and a list of candidates for the position of sergeant. The list described the candidates as "outstanding," "very good," "good" and "poor." During their meeting defendant expounded on the qualifications of the candidates. It was Olsen's opinion that defendant was trying to influence the oral board. As a result, he resigned from the board.

Lieutenant Smith and Lieutenant Hughes gave essentially the same testimony as Olsen. They also felt that they were being told which men to rate highly and which ones should not be considered for high ratings. Both men withdrew from the board.

Larry Miller, personnel analyst for Los Angeles County, was responsible for coordination of the promotional examination for sergeants' positions in the marshal's department in early 1973. On promotional examinations, the oral raters are usually chosen from outside the candidates' department because they want raters who have had no prior exposure to the candidates. It is always to be an objective process and the interviewers are not supposed to be influenced by outsiders or any prior knowledge. On recross examination Miller testified that he had previously explained to defendant the process of the promotional exams and the importance of keeping the different parts separate. He also stated that he believed defendant had been successful in encouraging the promotion of minorities within his department.

Elliot Marcus, division chief with the Los Angeles County Department of Personnel, testified that as a matter of policy, it was not permissible for a department head to discuss candidates with the oral board, even if the purpose was to go along with the minority affirmative action program.

Defendant testified on his own behalf and generally denied any criminal conduct as to counts I, III, V and VII. As to count IX defendant stated that he was trying to implement the county affirmative action policy and had spoken to the three lieutenants for that purpose alone. He had not been trying to influence the grade for any specific individual. As to count VII, defendant denied destroying any of the radio logs, that he took them home, later brought them back to his office, and that they were taken from his office by persons unknown. As to counts I, III, V, and VII, defendant denied that he had falsified any records, ordered anyone to do so, or destroyed any records. He did not wilfully cause any false documents to be made so as to cause the county to pay out money unlawfully for deputies' salaries or overtime.

On rebuttal Harold Gartner III, an attorney, testified that he was present at the November 12, 1973, meeting of defendant, Captain Perkins and Ritner. During their conversation defendant stated something to the effect that he had ordered the trip tickets destroyed and was "amazed when later he found out that either a duplicate set or the originals had been found."

## DEFENDANT'S CONTENTIONS

1. The motion to suppress evidence supplied to the grand jury pursuant to subpoena duces tecum should have been granted.

2. The conviction under count I is in error because the accounts and entries at issue were not false.

3. The conviction on count III was the result of a discriminatory prosecution and was unconstitutional.

4. The conviction on count III was in error because services are not "public moneys" within the meaning of sections 424 and 426 of the Penal Code.

5. The conviction on count III was in error because providing of transportation for dignitaries was within the marshal's authority, and hence there was no violation of Penal Code section 424, subdivision 1.

6. In applying Penal Code section 424, subdivision 1 in this case, the trial court interpreted the statute so that it is void for vagueness as to count III.

7. The conviction under count V is in error and must be reversed.

8. There was insufficient evidence to sustain defendant's conviction on count VII.

9. Hearsay testimony that violated the rule announced in *People* v. *Leach,* 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296] was received in evidence on count VII.

10. Defendant's conviction on count IX was the result of a coerced statement and should be reversed.

### DISCUSSION

1. ■ Contrary to defendant's assertions, his motion to suppress evidence pursuant to Penal Code section 1538.5 was properly denied. Prior to trial defendant sought to suppress certain evidence which included the time books, payroll cards, monthly personnel time sheets, radio logs and transportation requests. This evidence was supplied to the grand jury by various individuals pursuant to grand jury subpoenas ducès tecum served upon various custodians of such records in the marshal's department. Defendant argues that as the custodian of the records as Marshal of Los Angeles County, "his right to challenge the subpoena of the records was violated by the failure to serve the subpoenas on him personally." He asserts further that he was deprived of "his right to challenge the validity of the subpoenas in a pre-seizure hearing" and therefore was denied due process of law.

Under Penal Code section 919 the grand jury may inquire into the willful or corrupt misconduct in office of public officers of every description within the county. Penal Code section 921 provides that the grand jury "is entitled to free access, at all reasonable times, . . . to the examination, without charge, of all public records within the county." This section was enacted to avoid the rule in some jurisdictions that the

authority to investigate crimes and misconduct by public officers did not also permit the grand jury to examine public records. (*Board of Trustees* v. *Leach,* 258 Cal.App.2d 281, 285 [65 Cal.Rptr. 588].) Here, the grand jury was investigating possible misconduct by defendant as Marshal of Los Angeles County; all the records subpoenaed were official records of a county department; none were the defendant's private property. Under these circumstances, the grand jury had access to these records irrespective of any asserted rights by defendant Sperl.

Furthermore, where public records are the object of the subpoena, a person having custody of same cannot refuse to produce them on the basis of the privilege against self incrimination. Therefore, since defendant could not assert such constitutional right in public records, the necessity for personal service upon him does not arise in order that he may contest the issuance of the subpoena. A grand jury's power is analoguous to that of an administrative inquiry (Gov. Code, § 11180 et seq.). (See *United States* v.`Morton Salt Co.,* 338 U.S. 632, 643 [94 L.Ed. 401, 411, 70 S.Ct. 357].) Even though defendant, as Marshal, may have been the titular custodian and have had a general control over all documents within his department, nevertheless, a subpoena duces tecum could be lawfully directed to a subordinate within his department who had actual custody or control of the documents. There is no requirement that defendant, as the head of a county department, be personally served.

Defendant suffered no prejudice by reason of not being able to bring some form of "pre-seizure" hearing concerning whether or not the subpoenas duces tecum were properly authorized. At his 1538.5 motion, defendant contested the admissibility of such evidence and challenged both the efficacy and the legality of the subpoenas. Defendant's arguments were fully considered by the trial court and were properly found to lack merit.

2. ■ As to count I (Legislative Advocates Transaction), defendant contends that he was improperly found guilty of Penal Code[4] section 424, subdivision 3. He argues that since the court found that there was no underlying misappropriation as to count I, and that the lobbying activity was not inherently improper or inappropriate, "then it was not a false entry to indicate lobbying time as time worked;" and that "in light of the allowance for administrative corrections, such inaccuracies as existed in

---

[4]Unless otherwise stated, all sections cited are from the Penal Code.

the accounts did not rise to the dignity of false entries or the keeping of false accounts within the meaning of Penal Code section 424, [subdivision] 3." He further asserts that if there is no underlying misappropriation · as defined in section 424, subdivisions 1 and 2, subdivision 3 is "inoperative."

Section 424 provides in pertinent part: "Each officer of this state, or of any county . . . and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another; or . . . [¶] 3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relating to the same; or . . . is punishable . . ."

Clearly subdivision 3 does not become "inoperative"·when there is no misappropriation under subdivision 1. Subdivision 3 states a separate offense from that defined in subdivisions 1 or 2. The subdivisions of section 424 are in the disjunctive; one may be violated without violating the others; and they are couched in the alternative with the word "or" after each subdivision.[5]

In the present case there was overwhelming evidence to support the determination of the trial court that defendant ordered false entries to be made in deputies' time records. The record reveals that defendant instituted an elaborate system to falsify the records as to the legislative advocates. Defendant directed his secretary, Natalie Scotton, to "manufacture" overtime and to show the deputies present when in fact they ·were not present and working as deputy marshals in order that the advocates' time in Sacramento would not be "sacrificed." The record shows that defendant repeatedly instructed his secretary to falsify time records. Captain Perkins testified that defendant told him to mark the advocates present so they could take personal vacation time even though there was no vacation time left for them on the books. Such extensive evidence of fabrications and falsifications can hardly be termed "administrative corrections" as defendant argues. Defendant's systematic pattern of directing false entries to be made in the advocates' accounts falls within the meaning of section 424, subdivision 3.

---

[5]See *People* v. *Qui Mei Lee,* 48 Cal.App.3d 516, 521 [122 Cal.Rptr. 43], where the court states: "Whereas subdivision 1 refers to the *misappropriation* of public moneys, other subdivisions of section 424 address themselves to such misconduct as the making of unauthorized loans and profits from public moneys, the keeping of false accounts concerning such funds, and the willful refusal to pay them over upon proper demand."

Defendant also asserts that section 424, subdivision 3 relates only to false accounts, etc. relating to public moneys, and since the records of the deputies' time in Sacramento are not "accounts of or relating to *public moneys,*" the conviction must be reversed. Unquestionably, the advocates' time records "related" to the disbursement of public moneys. These records were used as the basis for the disbursement of county funds to the various employees and defendant was under an obligation as a public officer not to cause such funds to be paid improperly. The falsification of these records directly resulted in a monetary loss to the county since the advocates were receiving payment for work that was never performed. (See *People* v. *Marquis,* 153 Cal.App.2d 553, 559-563 [315 P.2d 57]; *People* v. *Dillon,* 68 Cal.App. 457, 461-469 [229 P. 974].)

3. ■ Defendant contends that his conviction as to count III (Candidates' Driver Transaction) should be reversed because the conviction was "the result of a discriminatory prosecution" in violation of the equal protection clause of the Fourteenth Amendment. He argues that Supervisor Hayes aided and abetted defendant in the alleged unlawful conduct and thus could have been charged with the same offense (violation of Pen. Code, § 424, subd. 1), and that the failure to do so violated his right to equal protection. However, defendant did not plead or prove this as a defense in the trial court below; he did not offer, or attempt to offer, any proof of alleged discriminatory prosecution or laxity of prosecution by the district attorney, until the motion for new trial hearing, at which time he sought to introduce this issue into the proceedings.

This issue should have been raised earlier, and preferably before trial. In *Murguia* v. *Municipal Court,* 15 Cal.3d 286, 293-294 fn. 4 [124 Cal.Rptr. 204, 540 P.2d 44], the court states: ". . . 'The question of discriminatory prosecution relates not to the guilt or innocence of [the accused], but rather addresses itself to a constitutional defect in the institution of the prosecution.' (*United States* v. *Berrigan* (3d Cir. 1973) 482 F.2d 171, 175.) As such, the claim 'should not . . . be tried before the jury . . . but should be treated as an application to the court for a dismissal or quashing of the prosecution upon constitutional grounds.' (*People* v. *Utica Daw's Drug Co.* (1962) 16 App.Div.2d 12 [225 N.Y.S.2d 128, 131].)

"Second, because a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense, we believe the issue should not be resolved upon evidence

submitted at trial, but instead should be raised, as defendants have done here, through a pretrial motion to dismiss . . ."

Furthermore, an examination of the record shows that no evidence was presented by defendant of discriminatory law enforcement as a defense to any count in the indictment. It is to be presumed that official duty has been regularly performed. (Evid. Code, § 664.) The defendant, therefore, had the burden of showing that official duty had not been regularly performed and that there had been intentional discriminatory enforcement. (*People* v. *Gray,* 254 Cal.App.2d 256, 265 [63 Cal.Rptr. 211].) Defendant's offer of proof for an evidentiary hearing, presented at his motion for a new trial, was totally inadequate. An offer of proof must be *specific* in its indication of the purpose of the testimony, the name of the witness, and the content of the answer to be elicited. (Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1311, p. 1212.)

Defendant merely stated that it "would be [his] desire to call Mr. Hayes and those personnel employed by Mr. Hayes who also used the County automobile." After the court denied his request for an evidentiary hearing, he then stated that he "did not propose to limit the scope of the interrogation to Supervisor Hayes and his deputies, but I had intended it to be broadened to include the testimony of the Marshal deputies who did the driving, and also of the investigators and Assistant or Deputy District Attorneys who made the investigation into this matter and who made the determination not to prosecute Supervisor Hayes." We have no way of knowing what the evidence at the requested hearing would have shown; however, we do know that it would be mere speculation to say that defendant's vague and nebulous offer of evidence would show actual and intentional discrimination in the enforcement of the statute in question. No indication whatsoever was given as to what testimony would be elicited from any of the individuals that defendant proposed to call. ■ "[A]n equal protection violation does not arise whenever officials 'prosecute one and not [another] for the same act' (cf. *People* v. *Montgomery, supra,* 47 Cal.App.2d 1, 13 [117 P.2d 437]); instead, the equal protection guarantee simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis." (*Murguia* v. *Municipal Court, supra,* at p. 297.)

4. ■ Defendant further contends that as to count III, he did not misappropriate "public moneys" within the meaning of Penal Code

section 424, subdivision 1, since his conviction was based upon the "use of a county car and the services of a driver on county time," and services do not constitute public moneys. This contention is without merit. Evidence was presented showing that the cost to the county for Baraldi's services and the operation of the county vehicle while transporting Hayes, his family and staff, amounted to $1,956.23.

In *People* v. *Holtzendorff,* 177 Cal.App.2d 788 [2 Cal.Rptr. 676], several employees of the Housing Authority were sent home by defendant to work on a campaign and were paid for this labor from Housing Authority funds. Although the court ruled that the moneys (salaries) misappropriated were not public moneys because they did not belong to the state or any political subdivisions, the court stated at page 806: "The defendant argues that if anything was taken from the Authority it was *services,* not *money.* But the services of these typing employees was not a commodity paid for and received and then diverted from its authorized purpose. It was the Authority's money that was appropriated and it went for services already rendered, but not to the Authority, nor for any use or purpose in the lawful execution of defendant's trust." (Italics added.)

As in *Holtzendorff,* the services of the deputy were not a commodity paid for and received and *then* diverted from their authorized purpose. Here, defendant as a county officer misappropriated county funds (salaries) for personnel performing activities which were clearly outside the scope of their proper duties. Under such circumstances the trial court properly found that the transportation of Hayes, his family and staff resulted in a substantial monetary loss to the county by reason of the payment of the deputies' salaries while performing these improper tasks and that this constituted a misappropriation of public moneys within section 424, subdivision 1.

In a narrower vein, defendant argues he did not pay Baraldi out of moneys entrusted to him because it was the county controller who actually paid Baraldi. Thus, while it might have been a criminal offense under Penal Code section 504,[6] it is not a violation of Penal Code section

---

[6]Penal Code section 504, provides as follows: "Every officer of this State, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of any such officer and every officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession, or under his control by virtue of his trust, or *secretes* it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

424, subdivision 1. The same defense was raised in *People* v. *Qui Mei Lee, supra,* 48 Cal.App.3d 516. Defendant was charged under section 424, subdivision 1 of the Penal Code as an aider and abettor of one Barber, the principal. Barber, as Medical Director of San Joaquin County, approved invoices for medical and laboratory services provided to the county by private physicians and laboratories. These invoices were automatically paid by the county auditor. Barber approved false invoices and through a complicated scheme collected the moneys from these invoices himself. The court, beginning on page 522, said: "Indeed, the *Dillon* [*People* v. *Dillon,* 199 Cal. 1 (248 P. 230)] case refutes defendant's argument that, within the meaning of section 424, a public officer is not 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys' if his duties merely include control thereof as distinguished from possession. Speaking of section 424, the *Dillon* court said, 'It is clear that said section has to do solely with the protection and safekeeping of public moneys . . . and with the duties of the public officer charged with its custody *or control* . . . .' (199 Cal. at p. 5.) (Italics added.) . . . The court further noted in *Dillon* that the mere fact that the defendant might have been prosecuted under the more general statute, section 504, was no bar to his being prosecuted under the more specific provisions of section 424. *(Ibid.)*

"No express language in section 424 restricts its application to cases where the public officer's duties include the possession of public funds. The history of section 424, as reviewed in the *Dillon* case, leaves no doubt that the section was also intended to cover instances where the officer was merely charged with the duty of controlling such funds.

"Through his approval of the invoices, and through his receipt of the local health district and state payments which he was obligated to transfer to the accounts of the county medical facility payees, Barber controlled 'the receipt, safe-keeping, transfer, or disbursement of public moneys' as required for section 424 to apply. (Cf. *People* v. *Dillon, supra,* at p. 4; *People* v. *Holtzendorff* (1966) [*supra*], 177 Cal.App.2d 788, 801 [2 Cal.Rptr. 676]; *People* v. *Schoeller* (1950) 96 Cal.App.2d 55, 56-59 [214 P.2d 572].) Within the meaning of section 424, it was not necessary that Barber be 'charged' with those duties *by statute.* (See *People* v. *Schoeller, supra,* at pp. 56-58.)"

5. ■ Defendant also contends that his conviction on count III was in error because providing transportation was "within the Marshal's authority," and if defendant abused that discretion the remedy should

have been administrative (censure, suspension, or demotion), but not criminal prosecution. He also asserts that the transportation of Hayes was "serving to promote the accomplishment of the principal purposes of the marshal's office." The evidence, however, shows that defendant did not have complete authority to provide unlimited transportation and chauffeuring, and that the transportation of Hayes' family and staff did not even have an indirect relationship to county business.

Robert Fraschetti, an administrative analyst in the Chief Administrative Office (C.A.O.) for the county, testified that transporting dignitaries "is not an accepted practice," and from a budgetary standpoint, the use of county vehicles would not be acceptable; that all the vehicles in the marshal's department are county property or subsidized out of the county general fund; and that "[a]ll reasons for transporting people, for the use of vehicles, must have the approval of the C.A.O. and the Board of Supervisors." Fraschetti further stated that when he investigated the marshal's department use of vehicles, he was not shown any transportation request forms.

Eddy Tanaka, chief analyst for the C.A.O., testified that it was county policy to have all travel, including that pertaining to deputy marshals, approved by the C.A.O. In August 1972 the county policy pertaining to the transportation of dignitaries was that they were escorted *if* it was in *direct* relationship to county business. Tanaka further testified that in August 1972 he was not aware that the marshal's department was using personnel and vehicles to transport members of the state Legislature and other dignitaries around Los Angeles County with some frequency. To his knowledge no approval was ever given to the marshal's department in 1971 and 1972 to undertake a program of transporting dignitaries on county time. He also stated that in 1971 and 1972 the sheriff's department and the district attorney received approval in advance from either the C.A.O. or the board of supervisors for activities described as legislative advocacy.

From the evidence presented, as discussed *ante,* the trial court properly found that "the transportation of Hayes, done with the frequency that it was and in the political context of the time, was so significantly beyond the scope of courtesy commonly extended mutually by public officials that no reasonable man could conclude other than that this activity was without authority of law."

Defendant's contention that he did not know the extent of the Hayes transportation is totally without merit. Deputy Baraldi's assignment was given to him directly by defendant for the period from January to the latter part of August 1972. Furthermore, when the investigation began, defendant went directly to Hayes' transportation documents and ordered them removed from the records. Defendant's actions cannot, as defendant argues, be categorized as merely an "abuse of discretion." From the evidence presented it was not unreasonable for the trial court to have concluded that defendant was guilty of a violation of subdivision 1, section 424, on count III.

6. Defendant's last contention regarding count III is that "[t]he standard employed by the Court in applying Section 424(1) was so vague that it denied [defendant] due process of law." He states that statutes must give citizens fair notice of what conduct constitutes a crime, and section 424 has never been applied to misappropriation of services.[7] He thus argues there was no definable standard for the court's finding that the free transportation of Hayes was "significantly beyond the scope of courtesy commonly extended mutually by public officials." We do not quarrel with the rule of law cited by defendant, but it does not aid him here. The law, including the cases cited by defendant, states that the ordinance must be so vague that it fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. The ordinance will be upheld if its meaning is reasonably ascertainable (see 1 Witkin, Cal. Crimes (1963) § 24, p. 28.) The trial court here, as well as the trial courts in *Holtzendorff* and *Qui Mei Lee,* had no difficulty in interpreting the statute. Clearly, it is a misappropriation of public funds to use publicly owned vehicles for unauthorized private use. It was reasonable for the trial court to have found that defendant knew his conduct was forbidden by the statute. Evidence (discussed *infra*) showed defendant personally, and with the aid of his colleagues, removed evidence of these transactions from official county records to prevent such conduct from coming to light. Neither the statute nor the court's interpretation of it are unconstitutionally vague.

7. As to count V, defendant contends that his conviction must be reversed because (1) the Legislature "did not intend to make it a crime to destroy public records without any fraudulent intent"; (2) that the entries

---

[7]He cites *Papachristou* v. *City of Jacksonville,* 405 U.S. 156 [31 L.Ed.2d 110, 92 S.Ct. 839] and *Grayned* v. *City of Rockford,* 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294] to the effect that it is a principle of due process that an enactment is void if its prohibitions are not clearly defined.

were not false; (3) that destroying records may violate subdivision 4 but not subdivision 3 of section 424; (4) that the accounts did not involve public moneys and (5) that there was "discriminatory prosecution" since the conduct in count V arose out of activities on behalf of Hayes. ■ As to the question of fraudulent intent, it is clear that fraudulent intent or an intent to deceive is not required under section 424, subdivision 3. (*People v. Johnson,* 14 Cal.App.2d 373, 379-381 [58 P.2d 211].)

■ Defendant's contention that he did not make any false entries is contradicted by the evidence, as discussed *ante* in Natalie Scotton's testimony. It is clear that the documents submitted to the payroll section were inaccurate since much of the overtime shown thereon had been "manufactured" to cover up the deputies' participation in improper activities. Scotton further stated that once these reports of overtime were submitted to the payroll department, nothing further was checked by the county.

There is no merit to defendant's assertion that the trial court found defendant guilty on count V solely because records were destroyed (thereby violating subd. 4, not subd. 3). The trial court merely stated that the destruction of records had been established in addition to the fact that the records had been altered. Clearly, defendant's conduct came within the proscription of subdivision 3.

Defendant's argument that the falsified accounts did not relate to public funds is erroneous. (See discussion of count III, *ante.*) The adding of overtime and the falsification of the time records resulted in a monetary loss to the county by reason of improper payment of salaries for unauthorized activities of county personnel.

Nor was defendant's conviction the result of discriminatory prosecution." (See discussion, count III, *ante.*) No evidence was presented showing that Hayes or anyone else was involved in retrieving time records; ordering them to be altered and resubmitting a second series of false time reports to the payroll department in order to cover up the deputies' activities at the marina. This was only done by defendant.

8. Regarding count VII, defendant contends there was no evidence showing that he either secreted or destroyed the radio logs which were removed from the county records and archives in violation of Govern-

ment Code section 6200.[8] He also asserts that, even assuming the evidence shows this, the radio logs are not public records and defendant, as marshal, had the authority to destroy the radio logs as he saw fit.

Concerning his first contention, the evidence presented (as discussed *ante,* under "Count VII—Candidate Driver Transaction—Radio Logs") convincingly demonstrated that defendant destroyed, removed, or secreted radio logs, and further comment by us on this point is unnecessary.[9]

Defendant's principal argument on count VII is that the maintenance of radio logs is not required by an ordinance or statute, therefore, because the marshal has control of all records of his office, he had the authority to do with the records as he saw fit.[10] This argument is meritless. A public official has no right to treat official government records of an office, such as the marshal's department, as his own. (See *People* v. *Thompson,* 122 Cal.App.2d 567, 571-572 [265 P.2d 590]; *People* v. *McKenna,* 116 Cal.App.2d 207, 209-211 [255 P.2d 452]; *People* v. *Pearson,* 111 Cal.App.2d 9, 16-19 [244 P.2d 35].) In *People* v. *Pearson, supra,* a captain in the sheriff's department destroyed records he had prepared while making several vice investigations. On page 18, the court stated: "The contention that the papers removed were not public records is a mere quibble . . . A paper written by a public official in the performance of his duties or in recording the efforts of himself and those under his command . . . is a public record and is properly in the keeping of the office. [Citations]."[11]

---

[8]Government Code section 6200 provides: "Every officer having the custody of any record, map, or book, or of any paper or proceeding of any court, filed or deposited in any public office, or placed in his hands for any purpose, who is guilty of stealing, wilfully destroying, mutilating, defacing, altering or falsifying, removing or secreting the whole or any part of such record, map, book, paper, or proceeding, or who permits any other person to do so, is punishable by imprisonment in the State prison not less than one nor more than 14 years."

[9]The trial court, on this issue, stated: "The . . . question is one of credibility. The People's theory of the evidence suggests that the defendant systematically gathered together certain records relating to transportation activities in his office and—in anticipation of their being sought by the prosecutor—either secreted or destroyed them. The defendant maintains he collected the records specifically to preserve them and that they thereafter were stolen from him.

"My view of the record requires me to reject the defendant's testimony on this issue..I find the defendant guilty as charged in Count VII."

[10]Defendant also argued that the court confused radio logs with trip tickets and the latter are clearly not public documents. The record does not substantiate defendant's contention.

[11]Defendant claims *Pearson* is inapplicable because a captain in the sheriff's department has no legal authority to destroy any records, while he, in contrast, as

As stated in *People* v. *Shaw,* 17 Cal.2d 778, 811 [112 P.2d 241] and the authorities cited therein, " 'In order that an entry or record of the official acts of a public officer shall be a public record, it is not necessary that such record be expressly required by law to be kept, but it is sufficient if it be necessary or convenient to the discharge of his official duty. "Any record required by law to be kept by an officer, or which he keeps as necessary or convenient to the discharge of his official duty, is a public record." . . .' "

Defendant's next argument as to count VII relates to "discriminatory prosecution." However, no evidence was introduced at trial showing that Hayes even suggested the removal and destruction of these documents. There was not one scintilla of evidence indicating Hayes could have been charged with a violation of Government Code section 6200. Moreover, defendant did not raise this as a defense during the trial. (See discussion on this point under count III, *ante.*)

9. In count VIII defendant was charged with conspiring with others in his office to violate section 6200 of the Government Code (destroying or secreting radio logs). He was found not guilty on this count; however, hearsay testimony given by his alleged coconspirators (Castaneda, Spencer, Alexander, Baraldi, and Johnson) was admitted under the coconspirator exception to the hearsay rule. (Evid. Code, § 1223.) Defendant claims one statement, made by Castaneda to Baraldi on November 15 about the radio logs that "They've been destroyed" was inadmissible under the rule enunciated in *People* v. *Leach, supra,* 15 Cal.3d 419.[12]

If there was error it was clearly nonprejudicial. Abundant evidence was properly admitted concerning the removal and *secreting* of incriminating radio logs. The trial court was more concerned with this aspect of

marshal, was entrusted with control of all records and had authority to treat them as he did. His argument is not persuasive.

[12]In *Leach*, the court on page 423 stated: "We hold herein that if hearsay evidence of the declarations of coconspirators uttered after the attainment or abandonment of the principal objective of a conspiracy is to be admitted for the truth of the matters asserted on the ground that the declarations were made during and in furtherance of a 'continuing' conspiracy, there must be adduced otherwise admissible evidence which is sufficient to establish prima facie, independently of the hearsay evidence in issue, that the conspiracy continued in existence through the time the declarations were made. Under this holding we find that hearsay evidence of certain coconspirators' declarations was erroneously admitted at the trial of these causes. We also find, however, that such error was not prejudicial to either of the defendants and accordingly affirm the judgments of conviction."

the charge than it was with any destruction of the records. It said, "[t]he People's theory of the evidence suggests that the defendant *systematically gathered together certain records relating to transportation activities in his office and—in anticipation of their being sought by the prosecutor—*either secreted or destroyed them." (Italics added.) Merely secreting the records is a violation of the section, and the statement of the court emphasizes it was persuaded by the evidence that showed defendant was trying to hide the records from the prosecutor.

10. ▮ On count IX, defendant contends that his conviction "was the result of coerced statements and therefore must be reversed with instructions to dismiss." He argues that he was "coerced" into making statements to the marshal's committee of the municipal court judges in March 1973 concerning the incident with the civil service rating board of three police lieutenants, and that this information ultimately came to the attention of the prosecutor because of this meeting. Therefore, "the testimony of the three lieutenants was the product of the involuntary statement."

However, no evidence was introduced showing that defendant was forced in any way to answer the judges' questions. He merely argues in his brief that he "probably" would have been fired. Further, there is no evidence to support defendant's assertion that the prosecutor would not have called the three lieutenants as witnesses but for his statements to the judges. Defendant's argument on this issue is sheer speculation. Nor is there any evidence that any statement he made was incriminatory; nowhere does defendant state the actual content of his discussion with the judges.

A review of the record reveals that there was substantial evidence showing that defendant was guilty of a violation of Government Code section 31114, subdivision 3, in that he furnished special and secret information for the purpose of either improving or injuring the prospect of persons about to be examined under a county civil service system and that his conviction was not the result of a "coerced statement" (see discussion *ante* "Count IX—Civil Service Board").

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied February 19, 1976, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied March 24, 1976.