Filed 3/8/21

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

MUNIR MTANEWS HAWARA,

    Defendant and Appellant.

E074698

(Super.Ct.No. RIF1605744)

OPINION

APPEAL from the Superior Court of Riverside County. Bernard J. Schwartz, Judge. Affirmed.

The Kent Law Firm and Jeffrey Donald Kent for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Munir Mtanews Hawara owned a liquor store. He hired one Willis Simmons to burn down a rival liquor store. Simmons tried to burn it down once, but failed. Simmons then subcontracted the job to one Randy Ramirez. Ramirez tried to

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III.A, III.B, III.C, IV, and V.

burn down the rival store three times, but he, too, failed. The scheme was exposed when Simmons's sister contacted police.

A jury found defendant guilty on four counts of arson of a structure. (Pen. Code, § 451, subd. (c).) On all four counts, state of emergency enhancements were found true. (Pen. Code, § 454, subd. (a)(2).) On two counts, accelerant device enhancements were found true. (Pen. Code, § 451.1, subd. (a)(5).) Defendant was sentenced to 11 years 8 months in prison, along with the usual fines, fees, and ancillary orders.

Defendant contends, among other things, that the prosecutor improperly cross-examined his character witnesses by asking them if it would change their opinion if they "knew" or "learned" about his commission of the crimes; he maintains that the only correct form for this type of cross-examination is to ask if it would change their opinion if they "heard" about his commission of the crimes. He also contends that his trial counsel rendered ineffective assistance by failing to object to the improper cross-examination.

In the published portion of this opinion, we hold that a defense character witness who testifies based on his or her own opinion — rather than based solely on the defendant's reputation — can be asked on cross-examination if he or she knows about the defendant's bad acts. Alternatively, we will hold that any error was harmless, because defendant's commission of the crimes was amply shown by other evidence.

In the unpublished portion of this opinion, we conclude that defendant has not shown any other error. Hence, we will affirm.

2

# I

## DEFENDANT'S CONTENTIONS

Defendant contends:

(1)  Defendant's trial counsel rendered ineffective assistance by:

a.  Failing to object at the preliminary hearing to evidence of a state of emergency.

b.  Failing to object to the inclusion of the state of emergency enhancement in the information.

c.  Agreeing not to cross-examine a fire investigator about having been accused of sexual battery.

d.  Failing to seek disclosure of the identity of a confidential informant.

e.  Failing to object to the prosecutor's cross-examination of defendant's character witnesses.

(2)  The prosecutor committed misconduct by telling the trial court, falsely, that defendant had been held to answer on the state of emergency enhancement.

(3)  The prosecutor committed misconduct by failing to investigate the confidential informant.

(4)  The testimony of defendant's accomplices was not adequately corroborated.

(5)  The trial court erred by excluding four of Simmons's thirteen prior convictions, which defendant sought to offer for impeachment, as cumulative.

Defendant has not shown any error.  Hence, we will affirm.

## II

## STATEMENT OF FACTS

Defendant went by the first name "Mark." He owned Tyler Market at Tyler Street and Wells Avenue in Riverside.

A store called Sunny's Liquor was kitty-corner across the intersection. Sunny's had a security gate, so it would be hard to break into it when it was closed. Access to the back and roof of Sunny's was blocked by a chain link fence, with barbed wire, and a pit bull.

A.     *A Series of Arson Fires at Sunny's Liquor.*

Throughout 2016, a state of emergency was in effect in California due to drought.

1.     *January 3, 2016.*

Fire investigator Captain Ray Mendoza investigated a fire at Sunny's that occurred around 2:00 a.m. on January 3, 2016. It had been started by a Molotov cocktail, as shown by the presence of a cigarette lighter, a wick or fuse, and broken glass, as well as by the burn pattern. The outside of the store suffered fire damage.

Surveillance video showed someone lighting something in his hand and throwing it at the front door.

2.      *March 4, 2016.*

Fire investigator C.B.[1] investigated a fire at Sunny's that occurred on March 4, 2016.  The point of origin was just inside a front window; the fire had blown the window out.  There had been an unusual amount of heat at floor level.  C.B. was not able to determine the cause of the fire until he watched a surveillance video.  The store suffered fire damage, including the broken window, broken liquor bottles, burnt flooring, and a burnt counter.

A surveillance video showed someone pouring gasoline through the mail slot and igniting it.

3.      *April 27, 2016.*

Fire investigator David Greyshock investigated a fire at Sunny's that occurred on April 27, 2016.  It had been started by throwing a Molotov cocktail at the front door, as shown by a cloth wick, broken glass, and the burn pattern.  A second, unbroken Molotov cocktail was found on the roof.  There was fire damage to the front door; the inside of the store suffered smoke damage.

Surveillance video showed someone run up and throw something downward, followed by a burst of flame.

---

[1]      We accord C.B. protective nondisclosure because defendant is contending that the trial court erred by excluding potentially embarrassing information about him. (See part III.B, *post*.)

4.     *November 11, 2016.*

Captain Mendoza also investigated a fire at Sunny's that occurred on November 11, 2016. A gas can had been left outside. The burn pattern indicated that someone had set fire to the gas in the can. The front door was damaged. The fire had partially penetrated the front door; one exterior wall was burned all the way through to the inside.

Surveillance video showed a male wearing a hoodie pouring gas across the storefront and igniting it.

B.     *Testimony of Accomplice Willis Simmons.*

Willis "Huero" Simmons had pleaded guilty to two counts of arson, based on the first two fires.[2] He was in shackles when he testified.

Simmons did odd jobs for defendant, such as painting the store windows. Defendant talked to Simmons about having Simmons beat up the owner of Sunny's. In November 2015, he offered Simmons a "couple hundred dollars" to burn Sunny's down.[3] Defendant explained that Sunny's was "taking all his customers" by lowering its beer prices.

---

[2]     Simmons had prior convictions for unlawful possession of a firearm, theft, assault, domestic violence, plus two prior convictions for forgery and two for burglary.

[3]     Simmons admitted that he did not want to testify, because he would be "labeled in prison or on the street" "[a]s a snitch." Through much of his testimony, he maintained that defendant asked him only to "scare" or "[i]ntimidate" the owner of Sunny's and never specifically asked him to burn Sunny's down. In pleading guilty, however, he had admitted that defendant asked him to burn Sunny's down. When confronted with this admission, he confirmed that defendant asked him to burn Sunny's down, not just to scare the owner.

On January 3, 2016, around 3:00 a.m., Simmons threw a Molotov cocktail at the front door of Sunny's. He accidentally left his lighter at the scene. A couple of days later, he told defendant what he had done. Defendant gave him $200, but said, "That's not the way it should be done."

Simmons did not want to get arrested, so he subcontracted the job to his acquaintance Randy "Psycho" Ramirez. Ramirez poured gas in the mail slot and set it on fire. Simmons reported this to defendant, who gave him $300 but said again, "[T]hat's not how it's supposed to be done . . . ." Defendant offered Simmons $1,000 "if it was done correctly." Ramirez went on to set one or two more fires at Sunny's. Simmons claimed that he split the $300 with Ramirez.

Simmons's sister, Georgia Villarreal, testified that Simmons told her that defendant offered him $10,000 to burn down Sunny's. He gave her details that were consistent with his testimony at trial.

Villarreal saw one of the surveillance videos on the news. She recognized Simmons from his "hunchback" and the way he walked.[4] On November 15, 2016, she contacted investigators. They contacted Simmons, who gave them a statement that was generally consistent with his testimony at trial.

---

[4] According to Villarreal, this was the video of the fire on November 11; it showed someone pouring gas all along the side of the building, as in the November 11 fire. However, according to all of the other evidence, it was Ramirez, not Simmons, who set this fire.

On November 18, 2016, at the request of investigators, Simmons visited defendant, at his store, while wearing a wire.

Simmons brought up "this business, across the street," and said "the guy" wanted to know when defendant would "get the rest of the money." Defendant replied, "If he finish the job." Simmons said, "I already gave him what you gave me last time." Defendant said, "Okay."

Defendant complained that it was not "fair" to expect him "to pay for something that wasn't done." "[T]he job wasn't done right." "Nothing was done like the way we talked . . . ." "[W]e talk[ed] about the work inside[,] not outside[.]" "Anybody can do it from outside. I can do it from outside. [¶] . . . [¶] Like the way he did it." "[N]othing was done, it was only the door." "I passed by there. It's [*sic*] was . . . only on the door."

Defendant assured Simmons, "I'm willing to work with you. . . . [D]on't you think I'm running away from that." "I give you $300, right?" "I did pay you, right? [¶] . . . [¶] First time. Second time. Third time." He cautioned: "I don't want you to call me and don't come to the store. . . . [W]hen the store's done then I will come and pay you." Simmons said, "I'll talk to Psycho today." Defendant replied, "Yes, please."[5]

---

**5**      It was the defense theory that defendant and Simmons were discussing the painting of store windows.

C.      *Testimony of Accomplice Randy Ramirez.*

Ramirez had pleaded to guilty to two counts of arson.[6] He was in shackles when he testified.

According to Ramirez, Simmons offered to split $10,000 with him if he burned down a certain liquor store. Later, Simmons pointed to a person outside a liquor store, kitty-corner across the street from the one he was supposed to burn down, and identified him as the person who was paying. Simmons told him the person's name was either Mark or Hawara (Ramirez did not remember which).

The first time Ramirez attempted to burn down the store, he poured gas in through the mail slot, then threw in a burning rag.

The second time, the mail slot was blocked, so he "threw a gas line on . . . the doors and windows." The gas can blew up, almost in his hands, so he "just took off."

The third time, he threw one Molotov cocktail at the door and another at the roof, then immediately took off running.[7] Simmons asked Ramirez to try again, but he refused. Ramirez claimed that he never actually got paid.

---

[6]      Ramirez had prior convictions for unlawful possession of a weapon and receiving stolen property.

[7]      From the physical evidence, it seems that Ramirez reversed the sequence of the April 27 and November 11 fires.

III

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises multiple claims of ineffective assistance of counsel.  "To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'  [Citation.]  To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'  [Citation.]"  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

A.  *Failure to Object at the Preliminary Hearing*

*to Evidence of a State of Emergency*.

Defendant contends that his counsel rendered ineffective assistance by failing to object at the preliminary hearing to evidence of a state of emergency.  He also contends that his counsel rendered ineffective assistance at trial by failing to object to the inclusion of the state of emergency enhancement in the information.

1. *Additional factual and procedural background.*

The original complaint, filed on November 29, 2016, did not allege a state of emergency enhancement. (See Pen. Code, § 454, subd. (a)(2).) However, the amended complaint, filed on June 29, 2017, did allege this enhancement.

At the preliminary hearing, on July 28, 2017, the prosecutor introduced the Governor's proclamation of a state of emergency; defense counsel did not object.

2. *Discussion.*

Defendant argues that his counsel could have objected to the proclamation as irrelevant, because the original complaint did not allege a state of emergency enhancement. Likewise, he argues that his counsel could have objected to the inclusion of the enhancement in the information. Actually, his counsel could not have raised either objection, because the enhancement had been alleged in the *amended* complaint, and thereafter defendant was held to answer on it.

In a related contention, defendant also argues that the prosecutor committed misconduct by telling the trial court, falsely, that defendant had been held to answer on the enhancement allegation. However, this was in fact true.

B. *Failure to Cross-Examine C.B. about*

   *Prior Sexual Battery Allegations Against Him.*

Defendant contends that his trial counsel rendered ineffective assistance by agreeing not to cross-examine fire investigator C.B. about being accused of sexual battery.

11

### 1. *Additional factual and procedural background.*

C.B. had investigated the second fire on March 4, 2016. The prosecution moved in limine to bar any attempt to impeach him with a prior arrest for actual or alleged sexual battery. It argued: "[C]onduct that occurred off-duty which did not result in charges being filed nor a conviction should be excluded because it creates a substantial danger of undue prejudice, of confusing the issues or of misleading the jury."

Defense counsel responded that she did not intend to introduce evidence of the incident: "We have no issue over the fire department's investigation of this case."

### 2. *Discussion.*

"[S]exual battery is a crime involving moral turpitude and, therefore . . . may be used to impeach." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 27; see *id*. at pp. 28-30; see also *People v. Dalton* (2019) 7 Cal.5th 166, 214.) However, under Evidence Code section 352, the trial court has discretion to exclude evidence of a prior crime, when it is offered for the purpose of impeachment, if it is more prejudicial than probative. (*People v. Smith* (2007) 40 Cal.4th 483, 512.)

Defendant claims his counsel agreed that the evidence was inadmissible. That is not accurate. She merely said that she did not intend to introduce the evidence.

There not only *could be* a reasonable tactical purpose for this decision, but, in fact, there *was*. Nothing to which C.B. testified was controversial or subject to doubt. He testified that he was not able to discover the cause of March 4 fire without the surveillance video — testimony favorable to the defense. He also testified that he

reviewed security camera video that showed a person starting the fire — testimony that was not favorable to the defense, but that also did not depend on C.B.'s credibility; the prosecution played the video for the jury. Introducing evidence that C.B. had committed (or had been arrested for committing) sexual battery would not have helped the defense case. At best, it would have taken up time; at worst, it would have made it look as if the defense was trying to embarrass C.B.. Defense counsel therefore made the wise tactical decision not to introduce this evidence. Moreover, for the same reason, defendant cannot show prejudice.

C. *Failure to Seek Disclosure Regarding a Confidential Informant.*

Defendant contends that his counsel rendered ineffective assistance by failing to seek disclosure of the identity of a confidential informant.

1. *Additional factual and procedural background.*

Detective Aurelio Melendrez testified:

"Q. . . . [D]id any other civilians . . . ever come to talk to you about having information regarding what happened at Sunny's?

"A. Yes.

"Q. Who else?

"A. I can't disclose her identity."

Defense counsel objected. There was an unreported sidebar conference.

At the next break, outside the presence of the jury, the trial court put it on the record that the prosecutor had said she was unaware of any confidential informant.

13

Defense counsel added that she, too, was unaware. Defense counsel moved to strike the question and answer. The trial court granted the motion. Thus, it instructed the jury:

"[T]here was a question asked this morning . . . of Detective Melendrez. . . . It was asked by [the prosecutor]. And the question . . . was whether anyone else had approached him regarding any of these incidents, and he responded that there was, there was a female, and he did not want to divulge the name.

"So I did discuss this with the lawyers, and it's not relevant to our proceeding. So what I'm going to do is admonish you that the testimony that you heard and the answer given by Detective Melendrez strictly about this woman whose name he does not want to disclose is stricken and you're not to consider that evidence for any purpose . . . ."

Outside the presence of the jury, the prosecutor told the court that she had checked to find out whether the confidential informant's identity or statements constituted exculpatory evidence that the prosecution was required to disclose. She explained: "[Detective Melendrez] did not speak directly to [the informant]. It was relayed by other detectives that — but he never spoke to the individual . . . ."

The trial court said to defense counsel, "Well, to the extent you want to follow up on that, whoever it was that may have talked to the mysterious woman, you can do so. Obviously, it will be potential *Brady* or not. I don't know. So you may want to look into that." Defense counsel said, "Yeah." The prosecutor promised to make a further disclosure, if "it becomes necessary."

2.    *Discussion.*

Defendant argues that his trial counsel should have filed a motion for disclosure of the informant's identity and of any information she might have. However, he has not shown that there could be no rational purpose for this omission. For example, defense counsel and the prosecutor may have discussed the matter further, off the record, and defense counsel may have determined that the informant had no useful information. Defendant also cannot show that the omission prejudiced him.

Defendant also argues that his counsel did not make sure that the trial court actually instructed the jury to disregard that testimony. However, the trial court did so instruct.

In a related contention, defendant also argues that the prosecutor committed misconduct by failing "to determine who the informant was and what [she] had to say."

A prosecutor has two separate disclosure obligations.

First, under the federal constitution, the prosecutor must "disclose to the defense material evidence favorable to the defendant." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 705; see also *Brady v. Maryland* (1963) 373 U.S. 83, 87.)

Second, under state statute, the prosecutor must disclose six types of information; the only one relevant here is "[a]ny exculpatory evidence." (Pen. Code, § 1054.1, subd. (e).)

Defendant has the burden of showing that the prosecutor violated these obligations. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 52 [federal constitution]; *People v.*

*Thompson* (2016) 1 Cal.5th 1043, 1103 [state statute].) On this record, he cannot do so. Again, the record does not show that the prosecutor actually failed to disclose the information; it also does not show that the information was exculpatory. "[S]peculation that favorable and material evidence might be found does not establish a violation . . . . [Citation.]" (*People v. Zaragoza*, *supra*, at p. 52.)

D.     *Failure to Object to the Prosecutor's Impeachment*

*of Defendant's Character Witnesses*.

Defendant contends that his counsel rendered ineffective assistance by failing to object to the prosecutor's improper cross-examination of his character witnesses.

1.     *Additional factual and procedural background*.

Defendant called Nolan Bryeans and Rene Torner to testify, at least in part, as character witnesses.

Thus, Bryeans testified that, in his opinion, based on his experience and also based on his discussions with others, defendant was honest and trusting.

On cross-examination, the prosecutor asked Bryeans, "Would it change your opinion at all if you knew that [defendant] had offered money to someone else to beat up an owner of another liquor store?"

She also asked, "Would it change your opinion if you learned that [defendant] offered money to someone else to damage or destroy another person's property?"

She then asked, "Would it change your opinion to learn that [defendant] paid someone else not once, not twice, but three times for burning someone else's building?"

16

Similarly, Torner testified that, in his opinion, based on his experience and also based on his discussions with others, and defendant was honest and sincere.

On cross-examination, the prosecutor asked Torner, "Would it change your opinion if you knew that [defendant] had offered someone money to beat up an owner of another liquor store?"

She also asked, "And if you learned that [defendant] had paid someone money not once, not twice, but three different times to burn down another's building, would that affect your opinion that he is an honest person?"

Defense counsel did not object to any of these questions.

2.    *Discussion*.

In a criminal action, the defendant may introduce evidence of his or her own good character. (Evid. Code, § 1102, subd. (a).) Such evidence may be in the form of a witness's own opinion, based on the witness's perceptions; or in the form of the defendant's reputation, based on what the witness has heard from others. (*Ibid*.; see also Evid. Code, §§ 800, 1324.)

Once a witness testifies, on direct, to the defendant's good character, it is a common and accepted method of cross-examination to ask whether the witness is aware of instances of the defendant's bad character. A variant of this is to ask, as here, whether the witness's opinion would change if the witness became aware of instances of the defendant's bad character.

17

Defendant argues that the only proper form for this line of questioning is to use the words "if you heard" about the instance of bad character, and that to use the words "if you learned" or "if you knew" is improper.

Actually, the rule is that, when the witness has testified to the defendant's *reputation*, based on what the witness has heard, the proper form is to ask, "if you heard." However, when the witness has testified to the witness's own *opinion*, based on the witness's perceptions, it is perfectly proper to ask, "if you knew." (1 McCormick on Evid. (8th ed.) § 48.) In each instance, the cross-examination question is tailored to undermining the claimed basis for the witness's testimony.

Before 1967, when the Evidence Code went into effect, a defendant's character witness could testify *only* in the form of reputation; character testimony in the form of an opinion was inadmissible. (*People v. Gordan* (1894) 103 Cal. 568, 573-574.) Hence, it was also the rule, at that time, that the cross-examiner was limited to asking, "if you heard" and was prohibited from asking, "if you knew." (E.g., *People v. Marsh* (1962) 58 Cal.2d 732, 745-746.) However, since the enactment of Evidence Code section 1102, allowing character testimony in the form of an opinion, this prohibition no longer exists.

Rather, "[w]hen, as here, a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of

18

the opinion has *knowledge* of events or acts which have indisputably[**8**] occurred."

(*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954, italics added.)

For example, in *People v. Lopez* (2005) 129 Cal.App.4th 1508, a character witness testified to the defendant's good character in the form of an opinion.  (*Id*. at p. 1527.)  The prosecutor then cross-examined her about the defendant's criminal history.  (*Ibid*.)  On appeal, the defendant argued that "the prosecutor should have asked about what [the witness] had heard, not about what she knew."  (*Id*. at p. 1528.)  The appellate court disagreed:  "[T]he rule invoked by defendant [is] limited to reputation witnesses.  When a witness offers an opinion of a defendant's good character, it is often based on personal knowledge as well as reputation.  [Citation.]  This opens the door for the prosecutor to offer rebuttal evidence of defendant's character.  [Citation.] . . .  The prosecutor can test the witness's opinion by asking about his or her knowledge of the defendant's misconduct [citation] . . . ."  (*Ibid*.)

Defendant cites *People v. Aguilar* (1973) 32 Cal.App.3d 478 and *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516.  Neither is relevant here.

In *Aguilar*, the character witness testified to the defendant's reputation.  (*People v. Aguilar*, *supra*, 32 Cal.App.3d at pp. 482-483.)  He was cross-examined using "have you

---

**8**     The events or acts may have "indisputably" occurred, as in *Hempstead*, but this is not a requirement.  It is enough that "the cross-examiner ha[s] in his possession information that reasonably leads him to believe that the acts of conduct by defendant have in fact been committed or the reports of their commission have been generally circulated.  [Citation.]"  (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 891, disapproved on other grounds by *People v. Kimble* (1988) 44 Cal.3d 480, 488.)

heard" questions.  (*Id*. at p. 483 and 483, fn. 1.)  The appellate court approved:  "In form

the questions fit the classic mold of impeachment of character witnesses.  [Citations.]"

(*Id*. at p. 483.)  This does not support the claim that "do you know" questions are *not*

proper.

*Qui Mei Lee* is even farther off the mark.  The issue there was whether a character

witness could be cross-examined about the acts for which the defendant is on trial; it held

that, under the circumstances, the witness could.  (*People v. Qui Mei Lee*, *supra*, 48

Cal.App.3d at pp. 526-528.)[9]  There was no issue regarding the form of the questions.

(See *ibid*.)

Here, defense counsel asked the direct questions in somewhat blended form.  She

asked each witness if he had an opinion of defendant's character, based on *both* personal

perceptions *and* discussions with others.  Nevertheless, because the witnesses testified to

an opinion about defendant's good character, based, at least in part, on their perceptions,

it was perfectly proper to cross-examine them about whether it would change their

opinion if they knew or learned about instances of defendant's bad character.

Our case *People v. Hurd* (1970) 5 Cal.App.3d 865 involved similarly blended

testimony.  There, a witness gave an opinion about the defendant's good character, based

on his personal experiences with the defendant and also based on meeting other people

who knew the defendant.  (*Id*. at p 877.)  On appeal, the defendant argued that cross-

---

[9]     Defendant does not contend that it was improper here to cross-examine the
character witnesses about the acts for which he was on trial.

20

examination using "have you heard" questions "was improper because [the witness] had not testified to the *reputation* of the defendant but had given his *opinion* as to the character of defendant." (*Id*. at p. 879.)  We agreed that there was "some logic" to this. (*Id*. at p. 880.)  We noted, however, that "the foundation for [the witness's] opinion was his personal acquaintance with defendant *and* his having met other people who knew defendant.  Under these circumstances it would not seem inappropriate that the prosecution be permitted to test the witness' knowledge . . . ." (*Ibid*., italics added.)  For the same reasons, "do you know" questions would have been equally appropriate.

Because the prosecutor's cross-examination was proper, defense counsel's failure to object was not deficient.

Separately and alternatively, it also was not prejudicial.  Even if defense counsel had objected — and even if the objections had been sustained — the prosecutor would simply have asked the same questions in "if you heard" rather than "if you knew" form. We see no reasonable possibility that this would have changed the outcome.  Defendant claims the "if you knew" form, when applied to the current charges, is prejudicial because it asks the jury to assume the defendant is guilty.  We disagree, for two reasons. First, both "if you heard" and "if you knew" are hypothetical.  Asking "if you knew" does not assert that the charges are true; it merely asks what the witness's opinion would be *if* they were true.  Second, the prosecution presented ample evidence that the charges were, in fact, true.  A couple of questions asking a witness to assume this could not have changed the jury's verdict. (*People v. Qui Mei Lee*, *supra*, 48 Cal.App.3d at p. 528

21

[asking character witness if he had heard of current charges, if error, was harmless; "long before [the witness] was cross-examined as to whether he had heard of the acts mentioned by the prosecutor, the prosecutor had already placed evidence of all those acts before the jury as integral parts of the People's case."].)

IV

THE SUFFICIENCY OF THE EVIDENCE

CORROBORATING THE ACCOMPLICE TESTIMONY

Defendant contends that, because Simmons and Ramirez were accomplices, their testimony had to be corroborated, but it was not.

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (Pen. Code, § 1111.)

"[T]he testimony of one accomplice cannot corroborate that of another accomplice. [Citation.]" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1222.) "The required corroboration must come from a source other than another accomplice. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 444.)

"The corroborating evidence may be slight and entitled to little consideration when standing alone. However, it must tend to implicate the defendant by relating to an act that is an element of the crime. It need not by itself establish every element, but must, without aid from the accomplice's testimony, tend to connect the defendant with the

22

offense. The trier of fact's determination on the issue of corroboration is binding on review unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 218.)

Here, defendant corroborated his accomplices himself, through his statements to Simmons when Simmons was wearing a wire. Defendant indicated that a job at the store across the street had not been done right. The work was supposed to be done inside, but "the guy" had done it outside instead. Defendant had passed by and had seen that the work was done only on the door. Defendant had paid the first time, the second time, and the third time; he was not going to pay again until "the store's done." Defendant wanted Simmons to talk to "Psycho." Defendant was secretive. He said, "I'm willing to work with you." But he also said, "I don't want you to call me and don't come to the store."

Defendant argues, as he did below, that the conversation could have related to a painting job. Simmons had painted defendant's store windows; however, there was no evidence that he had ever been hired to do any painting at Sunny's. More important, it is absurd that *defendant* would have been paying Simmons to paint *Sunny's*. Even assuming this was one viable interpretation of the conversation, the jury could reasonably interpret it as referring to arson, and on that view, it tended to connect defendant with the offense.

Defendant also argues that neither he nor Simmons used words like "arson," "fire," "gasoline," or "Molotov cocktail." An experienced detective, however, testified

23

that criminals, when talking about their crimes, tend "to talk in vague terms and not expressly state the actions[.]" Indeed, if Simmons had used the word fire, defendant might have become suspicious. The conversation still contained enough detail — about how defendant had paid Simmons to have another guy do a job at a store across the street, which had not been done properly, only outside, not inside, and only the door — to corroborate Simmons's and Ramirez's testimony.

Defendant also complains about the fact that Detective Melendez testified that defendant and Simmons were talking about setting fires. He claims this was offered as expert opinion; he then argues that it lacked a factual foundation. Even without this testimony, however, the jury could reasonably conclude, based on the other evidence in the case, that defendant and Simmons were talking about setting fires. Indeed, for this very reason, the testimony was proper lay opinion, not expert opinion.

The recording was admissible. The recording reasonably tended to connect defendant with the commission of the crime. Accordingly, the jury's implied finding that Simmons's and Ramirez's testimony had been corroborated is conclusive.

V

LIMITING THE ADMISSION OF SIMMONS'S PRIOR CONVICTIONS

Defendant contends that the trial court erred by letting him impeach Simmons with some but not all of Simmons's prior convictions.

24

A.    *Additional Factual and Procedural Background.*

Simmons had the following 13 prior convictions (all felonies, except for the petty theft):

(1) January 1994:  Second degree burglary.

(2) June 1994:  Receiving stolen property.

(3) August 1994:  Second degree burglary and receiving stolen property.

(4) April 1995:  Petty theft.

(5) February 1998:  Forgery.

(6) March 2001:  Unlawful possession of a firearm.

(7) July 2001:  Petty theft with a prior and aggravated assault.

(8) September 2002:  Second degree burglary.

(9) September 2002:  Receiving stolen property.

(10) June 2006:  Forgery.

(11) November 2009:  Second degree burglary.

(12) October 2016:  Domestic violence.

(13) May 2017:  Arson.

The prosecution moved in limine to exclude the convictions prior to 2006, as unduly remote.  Defense counsel opposed the motion.

The trial court excluded the four convictions prior to 1998, leaving nine.  It explained that it was doing so because they were cumulative, not because they were remote.

25

B. *Discussion.*

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 207.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Nine felony convictions, showing moral turpitude persisting over the span of more than 20 years, was more than enough to call Simmons's credibility into question. And even assuming that was not enough, we see no reason why four more convictions (one of them a misdemeanor), from even longer ago, would cause the jury to change its view of Simmons's credibility. All their admission could do was waste time. At a minimum, it was not an abuse of discretion for the trial court to so conclude.

Defendant claims the trial court's ruling violated his Sixth Amendment right to confrontation and cross-examination. "To establish a violation of his right of confrontation, defendant must show that the excluded evidence 'would have produced "a

significantly different impression of [the witness's] credibility.'"  [Citation.]"  (*People v. Sanchez* (2019) 7 Cal.5th 14, 45.)  That is not the case here.

## VI

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
                                                                                        P. J.


We concur:

McKINSTER
                              J.

MILLER
                              J.