Filed 2/10/15  P. v. Yates CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANA FITZGERALD YATES,<br><br>    Defendant and Appellant. | G050275<br><br>(Super. Ct. No. FVI-1100266)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, John B. Gibson, Judge.  Affirmed as modified.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Linh Lam, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant was convicted of a variety of crimes for assaulting and threatening his girlfriend. On appeal, he contends: 1) His character witness was subjected to improper cross-examination; 2) the trial court should have stayed his sentence for making a criminal threat; and 3) the judgment must be modified to correctly reflect the trial court's sentencing decision. We agree with appellant's third contention and modify the judgment accordingly. In all other respects, we affirm.

FACTS

In January 2010, 16-year-old Charlene D. met appellant, then age 42, through an online chat group. Within a week, they were dating and having sex, and eight months later, Charlene ran away from home and moved in with appellant. They shared an apartment with a woman named Barbara, who was 47 years old. Appellant told Charlene that Barbara was his cousin, but Charlene soon found out Barbara was another one of appellant's girlfriends. Even though Barbara and appellant had a sexual relationship, that didn't bother Charlene. In fact, she liked Barbara and often had "threesomes" in bed with her and appellant.

But this living arrangement didn't last long. On the night of September 30, 2010, appellant and Barbara had an argument, and she left the apartment with her belongings. The next morning, appellant told Charlene she had to move out because Barbara and her sons might be coming back to live at the apartment. Charlene packed her bags and went down to the bus station, but after a couple of hours she returned to the apartment. As she was unpacking her belongings, she could hear appellant talking to Barbara on the phone. Following the phone call, appellant poured himself a drink, sat down at the kitchen table, and began questioning Charlene about Barbara.

From the tone of appellant's questions, Charlene could tell he was upset. Although appellant did not say why he was mad, he indicated Barbara was lying to him about something, and somehow Charlene was to blame for something that had happened. Charlene told appellant she didn't know what he was talking about, but appellant

persisted with the questioning and became angrier by the minute. Although he had never been violent with Charlene before, he slammed her head into the kitchen table and started yelling and cursing at her. Then he punched her in the face and landed a barrage of punches to the back of her head as she stood up and tried to walk away.

Charlene begged appellant to stop, but he ordered her to sit back down at the table and continued to pepper her with questions. He also punched her in the head again and kicked her in the legs and side. Charlene said she wanted to leave, but appellant told her she wasn't going anywhere. He ordered her to stand up again, only to knock her down with another punch to the face.

While Charlene was on the floor, appellant punched and kicked her a few more times. Then he relented momentarily and told Charlene to go sit in the living room, which she did. More questions about Barbara followed, and then appellant grabbed a 20-inch souvenir baseball bat and started hitting Charlene with it. After beating her about the arms, legs and feet with the bat, appellant told her he was going to cut her up into little pieces and feed her body to coyotes out in the desert.

Hoping to avoid that fate, Charlene told appellant what she thought he wanted to hear, that Barbara had been having sex with other people. But that just made appellant angrier. After kicking Charlene in the head and the chest, he plugged in a clothes iron and burned her arm with it. He finally explained that the reason he was so upset was that Barbara had given him a sexually transmitted disease. Appellant felt Charlene was partly to blame because she failed to keep an eye on Barbara and make sure she was not sleeping around.

Charlene tried to reason with appellant, but he started hitting her with the bat again, as well as a large gin bottle. Charlene was getting lightheaded and sleepy, but appellant threatened to strangle her if she fell asleep, so she perked up. Appellant then opened the sliding glass door to the patio balcony. Even though the screen door was still shut, Charlene got up and ran straight through the screen in order to get some fresh air out

3

on the patio.  Appellant followed her outside, grabbed her by the hair and told her he was going to throw her off the balcony if she screamed.  Charlene remained silent as appellant walked her back inside the apartment.

Once inside, appellant started attending to the screen door.  While he was doing so, Charlene ran out the front door of the apartment and began looking for help.  Eventually, she spotted a woman who took her inside her apartment and called 911.  After the police and paramedics arrived, Charlene passed out and was airlifted to the hospital.  She was diagnosed with a fractured finger and an abrasion on her arm.  She also had facial swelling, bruised arms and legs, and complained of neck pain.  However, testing revealed no spine or head injuries, so she was released from the hospital after just two hours.

At trial, the defense argued Charlene lied about the attack.  While conceding Charlene and appellant may have gotten into an argument on the day in question, defense counsel claimed that Charlene exaggerated the intensity of the dispute and that her injuries were inconsistent with what appellant allegedly did to her.  The defense called appellant's current girlfriend, Alna Bullock, who testified she has dated appellant on and off for about four years and has never seen him act violently.

In the end, the jury acquitted appellant of one charge – torture.  But it convicted him of assault with a deadly weapon, inflicting corporeal injury on a cohabitant, making a criminal threat, statutory rape and felony false imprisonment.  The jury also found appellant inflicted great bodily injury on Charlene during the attack.  The court sentenced him to 11 years in prison for his crimes.

*Alleged Prosecutorial Misconduct*

Appellant contends the prosecutor committed prejudicial misconduct and violated his due process rights by asking character witness Bullock about the charged offenses on cross-examination.  We disagree.

4

As noted above, Bullock testified appellant never acted aggressively or violently in her presence. She described appellant as a "very mild-mannered person" and said he was not the type of person who liked to argue. On cross-examination, the prosecutor challenged Bullock's impression of appellant's character with the following line of questioning:

"Q. [Prosecutor]: Okay, so you also stated Mr. Yates is not a violent person. Is that right?

"A. Yes.

"Q. Okay. So if you were to hear that he beat someone with a bat, would you say that he's still not a violent person?

"A. That's not the person I know.

"Q. Well, that's not the question I asked. If you were told that the defendant beat someone with a bat, would you still say that he is not a violent person?

"[Defense Counsel]: Objection. Relevance, Your Honor.

"The Court: Overruled.

"[Bullock]: It could be construed as violence, but that's not something I've seen in him.

"[Prosecutor]: Okay, so . . . if he beat someone with a bat, it could be construed as being violent?

"A. It could be.

"Q. And if you were to hear that he punched someone in the head numerous times, would you still stay that he is not a violent person?

"[Defense Counsel]: Objection. Relevance, leading, outside the scope of direct.

"The Court: Well, it's cross-examination; so leading is . . . appropriate. Overruled.

"[Bullock]: It could be construed as that.

5

"Q.  You would agree that could be construed as being violent?

A.  It could be."[1]

It is undisputed that, by having Bullock testify to his peaceful disposition, appellant opened the door for the prosecutor to present adverse character evidence. (Evid. Code, § 1102.)  Indeed, the law is clear "the prosecution may cross-examine a defense character witness about acts inconsistent with the witness's testimony as long as the prosecution has a good faith belief that such acts actually occurred.  [Citation.]" (*People v. Kennedy* (2005) 36 Cal.4th 595, 634, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458-459.)  However, appellant contends the prosecutor's cross-examination was improper because she relied on the acts underlying the charged offenses to impeach Bullock.  Claiming there is no authority for this sort of impeachment, appellant argues it was unduly prejudicial because, in asking Bullock about the charged offenses, the prosecutor insinuated they were true.

The prosecutor did refer to the charged acts in questioning Bullock, but by that time the jury had already heard considerable evidence about them from Charlene, so the prosecutor had a good faith basis for believing they were true.  There was nothing in Bullock's cross-examination the jury had not already heard about in far greater detail from Charlene.  Moreover, it was clear from the prosecutor's questions that her references to the charged acts were for foundational purposes only.  The prosecutor wasn't attempting to establish the truth of the charges; she was simply trying to find out if Bullock's opinion of appellant would be any different if she were informed he had done something violent, which is a proper line of questioning.  (See *People v. Malloy* (1962) 199 Cal.App.2d 219, 226, 228–229, disapproved on other grounds in *People v. Kelley* (1967) 66 Cal.2d 232, 244.)

---

[1]  While defense counsel did not object to this line of questioning on the basis of prosecutorial misconduct, his persistent objections to it sufficed to preserve the issue of prosecutorial misconduct for purposes of appeal.  (*People v. Pearson* (2013) 56 Cal.4th 393, 434.)

In fact, the questions were logically relevant to test Bullock's loyalty to appellant and to allow the jury to assess the credibility of her testimony. Therefore, they were not improper, and the prosecutor did not commit misconduct by asking them. (*People v. Clair* (1992) 2 Cal.4th 629, 682-685 [a character witness may be impeached with knowledge of the defendant's alleged crimes]; *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, 527 [a defense witness's knowledge and understanding of the charged offenses is "highly relevant" to their opinion about the defendant's character].)

In any event, as it turned out, Bullock handled the questions about as adroitly as possible. While conceding the acts of punching someone and hitting them with a bat could be construed as violent, she said such behavior was out of line with appellant's character as she knew it. In other words, despite the allegations leveled against appellant in the present case, Bullock was adamant he was not the sort of person who would commit the charged offenses, which is precisely why the defense called her to the stand in the first place.

In sticking to her guns, it is clear, as appellant concedes, that "Bullock understood that the[] violent acts attributed to [appellant] were simply accusations [and] that it was the purpose of the trial to determine whether they were true or not[.]" We are confident the jurors fully understood this as well. Indeed, they were properly instructed, "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true," and they were not to "assume that something is true just because an attorney asked a question that suggested it was true." In light of these instructions and the way Bullock's cross-examination played out, it is not reasonably probable appellant would have obtained a more favorable verdict had the alleged misconduct not occurred. Thus, there is no cause for reversal. (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

*Sentencing Issues*

Appellant contends his sentence for making a criminal threat should have been stayed because the prosecutor relied on the threat underlying that offense in arguing

7

he was guilty of false imprisonment, for which he was also punished. Although appellant contends Penal Code section 654 precludes multiple punishment in this situation, we find appellant was properly punished for both offenses.[2]

In closing argument, the prosecutor told the jury the charge of making a criminal threat (§ 422) was based on a single act: Appellant's threat to cut up Charlene into little pieces and dump her body out in the desert for the coyotes. In comparison, the prosecutor relied on a variety of acts in arguing the truth of the false imprisonment charge. In asserting appellant unlawfully restricted Charlene by violence or menace (§ 236), the prosecutor alluded not only to appellant's threat about cutting up Charlene, but the violent conduct he used to restrain her and the multiple times he ordered her to sit down and stay put during the attack. However, because the prosecutor referred to the same threat in urging the jury to convict him of making a criminal threat and false imprisonment, appellant argues his sentence for the former offense must be stayed pursuant to section 654.

Under that section, "a defendant may be punished only once for '[a]n act or omission that is punishable in different ways by different provisions of law.'" (*People v. Mesa* (2012) 54 Cal.4th 191, 193, quoting § 654.) So, if the record revealed appellant's convictions for making a criminal threat and false imprisonment were based on the same single act, he could not be sentenced for both crimes. (*Id*. at p. 195.) However, as explained above, that is not the case. While appellant's threat about cutting up Charlene was used to prove both offenses, additional acts were involved in the crime of false imprisonment. Therefore, the focus of our inquiry is on appellant's mental state and the purpose behind his crimes: "If [both] of the offenses were incident to one objective, [he] may be punished for any one of [them] but not for [both]." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; see generally *People v. Jones* (2012) 54 Cal.4th 350, 359

---

[2] All further statutory references are to the Penal Code.

["when there has been a course of conduct rather than a single criminal act . . . the 'intent and objective' test" governs whether section 654 applies.) However, if appellant harbored separate, albeit simultaneous, objectives in carrying out the crimes, then he could lawfully be punished for both of them. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1112.)

Appellant argues that in threatening to cut up Charlene and in falsely imprisoning her, his sole objective was to make sure she did not escape sooner. This simply makes no sense. Telling someone your intent is to cut them up and feed them to coyotes is not calculated to damper their desire to escape. Quite the opposite – it will intensify that desire. No one who thinks the end game will involve being chopped up and fed to coyotes stays for the conclusion of the game.

That being the case, the trial court could reasonably find appellant harbored dual objectives in making a criminal threat against Charlene and falsely imprisoning her. In addition to appellant's desire to keep Charlene from escaping sooner, the record supports the inference appellant also wanted to terrorize Charlene by threatening her with the horrific prospect of being cut up and fed to coyotes. We therefore uphold the trial court's decision to punish appellant for both making a criminal threat and felony false imprisonment.

Lastly, the parties agree the abstract of judgment and minute order of the sentencing hearing do not reflect the fact the trial court awarded appellant 380 days of presentence credit, consisting of 190 actual days, plus 190 days of conduct credit. We will modify the judgment to correct this oversight. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [an appellate court may order the correction of a record that does not accurately reflect the oral judgment of the sentencing court].)

DISPOSITION

The clerk of the superior court is directed to: 1) Modify the minute order of the sentencing hearing and the abstract of judgment to reflect the trial court awarded

9

appellant 190 days actual credit, plus 190 days of conduct credit, for a total credit award of 380 days; and 2) send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                             BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.