Filed 3/8/23  P. v. Diaz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H048594 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1637553) |
| v. | |
| ANTHONY FELIX DIAZ, | |
| Defendant and Appellant. | |

A jury convicted appellant Anthony Felix Diaz of (1) oral copulation with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b))[1]; and (2) lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)).  Diaz raises four primary claims of error:  (1) the prosecutor committed misconduct in his cross-examination of Diaz's character witnesses; (2) the trial court erred in issuing an instruction regarding the use of the charged conduct related to the first count as propensity evidence in connection with the second count; (3) the trial court erred in allowing the alleged victim to testify with a support person present on the witness stand; and (4) the trial court erred in withholding certain school records subpoenaed by the defense.  As explained below, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

# I.    BACKGROUND

The jury trial centered on the testimony of I., the alleged victim, and Diaz, formerly the boyfriend of I.'s mother.[2]  I. testified to two events:  (1) In the spring of 2012, when she was eight years old, Diaz inserted his penis into her mouth while she was trying to sleep; and (2) in the summer of 2012, when she was eight or nine years old, Diaz entered her room at night and, after she persuaded him not to lower his pants, kissed her several times.  Diaz denied the first event.  As to the second, Diaz conceded having kissed I. but denied any lewd intent.  As reflected by its verdict, the jury found I.'s testimony credible.

At trial, I., then 16, described the circumstances of the alleged offenses and her delayed decision to report them to a school counselor and, ultimately, to law enforcement.  At age eight, I. lived in a house with her mother D., Diaz, and J., the son of D. and Diaz.  D. and I.'s biological father shared custody of I., who alternated between their residences.  I. had no memory of a time when her parents were in an intact relationship.  When Diaz began living with D., I., and J.—well after J. was born—I. felt for the first time that she was part of a complete family.

Due to D.'s schedule, Diaz was regularly the only adult in the house, including during the children's bedtime routines.  In early 2012, D. was studying to become a registered nurse while working as a licensed vocational nurse.  Her work shifts could be irregular and could require her to work past the children's bedtime or to get up early in the morning.  When Diaz was the only adult in the house, he was in charge and the children were expected to follow his instructions.

---

[2] We use first initials to refer to I. and her family members in an effort to protect her privacy.

D. and Diaz had at one point been engaged, but by 2012 the engagement had ended due to tensions in the relationship. Diaz testified that he "stayed in the relationship" after calling off the engagement "for [his] son."

One evening in the spring of 2012, Diaz showed I. a rifle and put it in her hands. His stated purpose for doing this was to teach her about gun safety, as he had recently acquired guns and was keeping them in the house. Diaz told I. that showing her the guns was "our little secret." D. did not approve of his keeping guns in the house and had warned him not to show them to the kids. Diaz told I. that when she turned 10, he would take her to a range and teach her to shoot.

The experience left I. with a sense of foreboding: she "felt like something bad was going to happen, something not normal." Later that evening, according to I., Diaz sent the children to bed early. The children slept next to each other in sleeping bags on the floor of I.'s room. As I. was sleeping, or on the brink of falling asleep, she felt fingers pulling her mouth open. She thought it was J., who sometimes put his fingers in her mouth to make fun of her for sucking her finger as she fell asleep. Her eyes still closed, she eventually stopped resisting and let her mouth open. What she next felt in her mouth was bigger than a finger, and she spit it out by closing her mouth; the prying resumed, and she again spit out what reentered her mouth.

I. opened her eyes to find Diaz squatting over her, now pulling up his shorts. From this, she understood that it had been Diaz's fingers prying her mouth open and then Diaz's penis in her mouth. Diaz told I., "If you don't want our family to be broken up, then you need to keep this our little secret." I. lay back down, tucking her head under her pillow and against her shoulder protectively. J. remained asleep in the room throughout the encounter.

From then on, I. was afraid to fall asleep at night and experienced stomach pains. She told no one what had happened: "I always wanted to experience what it felt like to have a mother and a father in the same house and to have that, and being happy, like the

3

way you see on TV. And when Anthony came in, I thought that I finally had that, and I didn't want to lose it."

One night that summer, I. was sleeping alone in her room. In I.'s telling, she woke to find Diaz approaching the foot of her bed, reaching for his waistband and taking down his shorts. Afraid he intended to put his penis in her mouth again, I. pleaded, "Anthony, please, no. Please, no. Not again." Diaz assured her, "Oh, it's okay. It's okay. We don't have to." Leaning over her as she lay in bed, Diaz proceeded to kiss I. on the lips. I. told Diaz her stomach hurt, so Diaz took her to the kitchen and gave her some Tums. Still accompanied by Diaz, I. went into her brother's room and crawled over the still-sleeping J. to be next to the wall. Diaz told her to sleep but added, "This is our little secret." He then puckered his lips and pointed to them. After I. kissed him on the lips, he told her, "Again." I. kissed him again. "Again," he repeated, and I. kissed him a third time. Diaz looked at her and raised his eyebrows, which I. took to be a further directive to kiss him again, so she kissed him a fourth time, again on the lips, before Diaz left the room.

I. waited for hours to be sure Diaz would be asleep, then woke D., asking to have medicine for her stomach pain. Once in the kitchen, I. asked D. if it was normal for parents to kiss their kids on the lips. D. told I. that it was normal in some families but not theirs. I. asked D. to wake her before going to work the next day, so I. could go to her grandmother, who resided in a converted garage on the property.

D. woke Diaz the following morning to confront him. D. testified that Diaz "suddenly woke up" and "looked scared" when she asked him if he had gone into I.'s room and kissed her. Diaz told D. I. had been having a nightmare, and it was only due to I.'s movement that his kiss landed on her lips.

D. left that morning without waking I., who as a result found herself once again in Diaz's care. When D. returned home from work in the afternoon, I. was upset with her for confronting Diaz, because Diaz now was angry that I. had failed to keep their secret.

4

I. told D. that she had wanted to be woken up because she did not want to be alone with Diaz.

From then until Diaz eventually moved out of the house, I., with D.'s assistance, would often sneak out to sleep in her grandmother's converted garage. I. and D. put pillows in I.'s bed to make it look like I. was sleeping there, instead. On at least one night they left jacks and marbles on the floor in I.'s room to alert her in case Diaz tried to enter. D. attempted to set up a hidden camera in I.'s room.

D. reported this second incident to the sheriff's department[3] a short time after it occurred. D. was concerned that I. was withholding information.

In August 2012, the sheriff's office interviewed I. I. reported only that Diaz had kissed her on two instances—accidentally on the day he showed her the rifle and intentionally five times on a different night. In a handwritten journal she showed to the interviewing officer, she had described Diaz touching her all over her body. Asked about this, however, I. said that it referred to tickling and that Diaz sometimes tickled her when they played. I. told no one about the first incident: "I knew what had happened. The first night was really bad, that it would -- and that he would end up in jail if I said anything. . . . So I thought it was a good idea to try to keep my brother's dad in his life as much as possible." She was also afraid of how her father would react, not wanting her father to get into trouble for what he might do.

The sheriff's department determined that Diaz had not committed any crime, and informed D. of their conclusion.

In August or September 2012, Diaz moved out of the house. After Diaz left the household, I. feared what might happen to her for lying to the sheriff's office in the initial

---

[3] Diaz was a deputy in the county sheriff's corrections department. The residence where the offenses occurred was in the City of San Jose.

interview, what Diaz might do if she told the truth, as well as what her father might do to her or Diaz and what consequences her father might then face himself.

About three years after Diaz moved out, I., then 12 years old and in seventh grade, separately told three friends that Diaz had put his penis in her mouth. I. had become concerned that Diaz might do what he had done to her to J.; she also feared that the experience "was going to start to eat [her] from the inside out." With encouragement from a friend, she also made a report to a school counselor. This generated a report to Child Protective Services and ultimately an investigation by the San Jose Police Department. After interviewing I. in May 2016, the police arrested Diaz.

Testifying on his own behalf, Diaz confirmed that he had shown I. his rifle and told her to keep the interaction a secret. He attributed the need for secrecy to D.'s "ignorant" view that guns should not be shown to children. Diaz denied ever putting his penis in I.'s mouth or even kissing I. on the lips that night.

Diaz acknowledged having kissed I. on the lips but testified that it was not the night he showed her the rifle. The first time was an accident. Diaz explained that he had been moving forward to kiss I. on the cheek, but her movement at the last moment caused his lips to land on hers.

As to the night of the incident I. initially reported to D., Diaz testified that he was in the living room when he heard I. yelling, which she often did when having a nightmare. It was typically D. who went to calm I. down, so Diaz did not immediately intervene, thinking that D. would wake up and tend to I. But when I. began "thumping" into the wall and D. did not emerge from the master bedroom, Diaz went to I.'s room. Diaz woke I., calmed her down, and gave her a kiss on the lips, assuring her everything was okay. Prior to that moment, Diaz had never intentionally kissed I. on the lips, as he thought it would make her feel uncomfortable. I. complained of stomach pain, so he gave her Tums and, at her request, put her to bed in J.'s room. He kissed her on the lips one more time when he said goodnight.

6

In the operative information, amended to conform to proof at trial, the District Attorney charged Diaz with (1) oral copulation or sexual penetration with a child 10 years of age or younger, a felony; and (2) lewd or lascivious act on a child under 14, a felony. The jury found Diaz guilty on both counts. The trial court sentenced Diaz to (1) 15 years to life on Count 1; and (2) the mitigated term of three years on Count 2, concurrent to Count 1; with a total of 325 days credit for time spent in custody. Diaz timely appealed.

## II. DISCUSSION

### A. *Prosecutorial Misconduct*

#### 1. *Legal Principles*

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

#### 2. *Additional Background*

Both parties requested that the trial court order the exclusion of witnesses from trial proceedings pursuant to Evidence Code section 777, subdivision (a). The trial court granted the requests.

The defense called three character witnesses during trial—two of Diaz's cousins and his godfather. Diaz's cousins testified that Diaz had not demonstrated a "sexual or unnatural interest in underage females." Diaz's godfather testified that Diaz is a "[v]ery honest young man."

7

The defense indicated its intention to call a fourth character witness, an uncle, who attended trial proceedings in violation of the court order. After the prosecutor argued that Diaz's failure to instruct his uncle to leave the courtroom was a proper subject for cross-examination of Diaz, Diaz's trial counsel decided it was "prudent to leave [the uncle] off the witness list." Thus, the trial court was never asked to rule on any request to exclude the uncle's testimony.

The prosecutor cross-examined each of Diaz's three character witnesses by eliciting the foundation for the direct testimony in support of Diaz's character. In that line of questioning, the prosecutor confirmed that they had not attended trial and were not familiar with the evidence that had been presented to the jury. Diaz's trial counsel did not object to the questions.

### 3. *Analysis*

On appeal, Diaz begins with the principle that a prosecutor may not ask a jury to convict a defendant for want of evidence that the court excluded on the prosecutor's own motion. (See *People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758 [misconduct to argue for inference excluded evidence was intended to refute]; *People v. Varona* (1983) 143 Cal.App.3d 566, 569-570 [prosecution may not argue that defendant has not brought forth evidence to corroborate an essential part of his story where the defense was ready and willing to produce such evidence but was foreclosed from doing so due to the prosecution's objections].) Diaz contends that the prosecutor's conduct, in cross-examining his character witnesses, was similarly unfair because the prosecutor prevented Diaz's character witnesses from attending trial yet "attacked the credibility of each of Mr. Diaz's character witnesses precisely because they observed the exclusion order and

8

had not been present for I.'s testimony []or any other evidence." We perceive no impropriety in the prosecutor's cross-examination.[4]

" '[W]hen, as here, a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has *knowledge* of events or acts' " that have occurred, provided, for example, that " 'the cross-examiner' " possesses " 'information that reasonably leads' " the cross-examiner " 'to believe that the acts of conduct by defendant have in fact been committed or the reports of their commission have been generally circulated.' " (*People v. Hawara* (2021) 61 Cal.App.5th 704, 713, fn. 8.) These events or acts may include the filing of criminal charges. (*People v. Clair* (1992) 2 Cal.4th 629, 684; see also *People v. Lee* (1975) 48 Cal.App.3d 516, 527 [character witness who gives a present-tense opinion of a criminal defendant's character at trial may be cross-examined as to knowledge about the pending criminal charges where relevant to the character trait].) Accordingly, Diaz does not contend that it was improper for the prosecutor to ask his character witnesses about their knowledge of the allegations underlying the criminal charges at issue or the evidence and testimony adduced at trial. In context, asking the character witnesses whether they were present at trial was merely a shorthand means of establishing that the witnesses lacked knowledge of the evidence against Diaz to which both the cross-examiner and the jury were now privy, to establish the foundation for the witnesses' opinions, as relevant to the weight to be given to it.

Neither the witness exclusion order nor the withdrawal of Diaz's uncle as a witness rendered the prosecutor's questions improper. Unlike the cases on which Diaz relies, this is not a case where the prosecutor secured the exclusion of specific evidence

---

[4] We need not address forfeiture or Diaz's contention that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's alleged misconduct.

9

and then argued adverse inferences from the failure to present that evidence. The questions as posed did not suggest that it was incumbent on the character witnesses to attend trial—something both parties successfully sought to prevent.[5] Simply, the parties' parallel requests for an order excluding witnesses from observing the trial until the conclusion of their testimony does not preclude the prosecutor from asking otherwise proper questions establishing the foundation for the character witnesses' opinions. Had trial counsel perceived any risk of an illegitimate adverse inference from the cross-examination—i.e., that the prosecution was in some way impugning the character witnesses' personal character for their absence from the trial, rather than clarifying the foundation for their opinions—trial counsel could have elicited from the character witnesses their reason for not attending earlier portions of the trial.

**B.**     ***Propensity Evidence***

Relying on *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), the trial court instructed the jury that it was permitted to consider the alleged oral copulation as evidence that Diaz committed a sexual offense when he kissed I., provided the former was proven beyond a reasonable doubt. Diaz challenges the instruction on two theories: (1) the California Supreme Court wrongly decided *Villatoro*; and (2) even under *Villatoro*, the trial court erred by failing to conduct an Evidence Code section 352 balancing in deciding whether to issue the instruction.

As a matter of law, we are bound to apply *Villatoro*. There, in approving the specific instruction before it, the Supreme Court held that a defendant's commission of some of the charged sexual offenses may be considered as evidence of the defendant's propensity to commit the other charged sexual offenses, subject to an Evidence Code section 352 weighing analysis. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1156, 1159-1168.) In

---

[5] Diaz does not contest his trial counsel's tactical decision to independently move for the exclusion of witnesses or to withdraw the character witness who violated the exclusion order.

*Villatoro*, the trial court instructed the jury: " 'The People presented evidence that the defendant committed the crime of rape as alleged in counts 2, 4, 7, 9, 12 and 15 and the crime of sodomy as alleged in count 14. . . . If you decide that the defendant committed one of these charged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit the other." (See *id*. at p. 1167.) Diaz does not contest that the instruction here accurately reflects the law as set forth in *Villatoro*[6] but argues that *Villatoro* was wrongly decided. We decline the invitation to relitigate the issues decided in *Villatoro*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California."].)

As a matter of record, Diaz's second contention—that the trial court failed its duty to consider Evidence Code section 352 before giving the instruction—is plainly wrong: the Attorney General in response has directed Diaz's attention to the transcript of the trial court's express balancing under Evidence Code section 352. We understand Diaz's silence on this point in his reply brief as a concession, and we identify no error in the trial court's issuance of the challenged propensity instruction.

## C.     *Support Person*

I., who was 16 at the time of trial, testified with one support person physically present on the witness stand, with two individuals filling the role over the course of her testimony. Neither support person was a testifying witness. After the close of evidence, the trial court instructed the jury pursuant to CALCRIM No. 377 not to consider the presence of a support person on the stand during her testimony "for any purpose."

First, Diaz contends that the presence of a support person improperly bolstered I.'s credibility. Diaz concedes that the trial court complied with *People v. Chhoun* (2021) 11

---

[6] Diaz does not challenge the trial court's decision to limit the instruction to a single direction by instructing only that a finding beyond a reasonable doubt on count 1 could be used as propensity evidence in assessing count 2.

Cal.5th 1, 38 (*Chhoun*), in which our Supreme Court held that "[a] support person's mere presence in the courtroom or at the witness stand does not infringe the defendant's due process or confrontation rights unless there is evidence of improper interference by the support person." Diaz does not contend that there is any evidence of improper interference by either support person, nor have we identified any such evidence in the record. Diaz instead argues that California law is constitutionally infirm. Following *Chhoun*, we conclude that the mere presence of either support person at the witness stand during I.'s testimony did not violate Diaz's constitutional rights.

Second, Diaz argues that the prosecutor improperly referred to the support person and elicited testimony from I. concerning the support person, with the effect of bolstering I.'s testimony. On direct, I. identified the support person "sitting next to" her as "Karla," her "advocate" who "has been present whenever" I. came to court. During the second day of I.'s testimony, the prosecutor stated that a different person "has been here [as] the advocate for [I.]" that afternoon because I.'s other support person was "away for an appointment."

Accepting, as we must, the proposition that a support person's mere presence at the witness stand does not violate a defendant's constitutional rights to due process and confrontation (see *Chhoun*, *supra*, 11 Cal.5th at p. 38), we are unable to conclude that the specific references made to the support persons here—which go no further than to describe the support person as an "advocate" who accompanies I. whenever she has gone to court—violate Diaz's constitutional rights.[7]

---

[7] Diaz's argument is drawn from *People v. Patten* (1992) 9 Cal.App.4th 1718, 1732 (*Patten*), which distinguished between a "support . . . person sitting unidentified in the public section of the courtroom" and a support person sitting "closer" to the witness. In *Patten*, the alleged victim received support from two persons, whose physical position at the time of her testimony was not made a part of the record. (*Id.* at p. 173; see *id.* at pp. 1724, 1732-1733.) The court held that the defendant had "not presented any facts here that the particular practice presented an unacceptable risk" or "a due process violation." (*Id.* at p. 1733.) Thus, *Patten* supports the conclusion that the identification

Diaz contends instead that the references to the support persons effectively bolstered I.'s credibility in that the jury would have understood that the "advocate" was a "neutral person who believed [I.] was inappropriately touched in a sexual way." But the *Chhoun* decision rejected "[c]oncerns about improper vouching" arising from the presence of a second person on the witness stand because the presence " 'does not require the jury to infer that the support believes or endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 37.) Under that rationale, we are unable to distinguish the identification of the support person accompanying an alleged victim as her "advocate" from the "mere presence" of a "support person." It should be axiomatic that one may serve as an advocate for a person without expressing a personal opinion on the objective merits of the person's position. Thus, we are not persuaded that the identification of the support person as I.'s "advocate" rose to the level of improper vouching.[8]

Nor did the identification of the support person as I.'s advocate violate Diaz's confrontation rights. There are "four key components to the confrontation right: '(1) the face-to-face confrontation, (2) the oath, (3) the cross-examination, and (4) the jury's observation of the witness's demeanor.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 38.) Diaz, whose trial counsel did not object to the identification of the support person, has not

---

of a support person does not violate due process. Moreover, to the extent that *Patten* could be read to suggest that the mere presence of a support person on the witness stand violates due process or confrontational rights, that reading is superseded by *Chhoun*.

[8] As taken up below, Diaz contends on appeal that the trial court should have admonished the jury that I. was entitled to be accompanied by a support person. Focusing on the issue of vouching, we do not believe that there is a material distinction between an "advocate," a "support person," and an unidentified person sitting with the witness. However the role is presented, one might speculate that the person's presence reflects a belief in the veracity of the witness's account, but where the circumstances do not "require" such an inference, the possibility of such speculation is not a basis for disturbing a jury's verdict. (See *Chhoun*, *supra*, 11 Cal.5th at p. 37.)

13

explained how any of the statements about the support person made by I. or the prosecutor violated his confrontation rights, and we are unable to independently identify any interference with the four key components of that right.

Third, Diaz argues that, even if I. was entitled to testify with a support person at the witness stand, the trial court (1) "failed to admonish the support person not to 'prompt, sway, or influence [I.] in any way' " and (2) "failed to inform the jury that [I.] was entitled by law to be attended by a support person during her testimony and to admonish them that neither [support person was] 'a witness.' "

As to the first argument, the Supreme Court in *Chhoun* observed that there has been a split of appellate authority as to whether section 868.5, subdivision (b), requires the admonition identified by Diaz "in all cases or in all cases involving a support person who will also be a witness." (*Chhoun*, *supra*, 11 Cal.5th at p. 36.) The *Chhoun* court declined to resolve the split, reasoning that "any error in failing to admonish the support persons was harmless" because "there [was] no evidence that a support person prompted, swayed, or influenced the witnesses in any way." (*Id.* at pp. 36-37.) Here, as in *Chhoun*, the admonition was not given and there is no evidence that a support person prompted, swayed, or influenced I.'s testimony. Accordingly, we follow the Supreme Court in holding that "any error in failing to admonish the support persons was harmless." (See *id.* at p. 37 [assessing harmlessness under *People v. Watson* (1956) 46 Cal.3d 818, 837].)

As to the second argument, Diaz relies on *People v. Myles* (2012) 53 Cal.4th 1181, 1215 (*Myles*) and *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1078 (*Ybarra*), overruled on other grounds by *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370-1371. In *Myles*, the defendant argued that "he was prejudiced by [a] support person's presence on the witness stand while Donna testified because it created a false and distorted view of Donna's demeanor and tacitly vouched for the truth of her testimony." (*Myles*, *supra*, 53 Cal.4th at p. 1214.) But the Supreme Court found nothing in the record "indicating that Donna's support person improperly influenced the jury's assessment of her testimony."

14

(*Ibid.*) Going further, the Supreme Court explained that an admonition "that Donna was entitled by law to be attended by a support person during her testimony, and . . . that the support person was 'not the witness' " coupled with an "instruction directing the jury to base its decision in the case solely on the evidence received at trial and not to be swayed by sympathy or prejudice" sufficed to "undermine[] any suggestion of improper interference by the support person." (*Id.* at p. 1215; see also *Ybarra*, *supra*, 166 Cal.App.4th at p. 1078 [similar admonishment].)

The trial court's failure to explain the support person's role left the jury to accept as undisputed the characterization of the support person as an advocate. But we are mindful that the trial court did instruct the jury not to consider the presence of a support person on the stand during her testimony "for any purpose." Having applied *Chhoun* to conclude that the presence of a support person on the witness stand and the comments about the support person made by I. and the prosecutor did not constitute improper vouching or infringe upon constitutional confrontation or due process rights, we are unpersuaded that any instructional error was prejudicial. (See *Chhoun*, *supra*, 11 Cal.5th at pp. 37-38.)

**D.**     ***School Records***

Prior to trial, the defense sought I.'s school records by subpoena. Three school districts responded by producing records to the trial court under seal. After reviewing the records in camera, the court released the records from two of the three, withholding only I.'s high school records from the remaining school district.

As the court explained, it conducted its in camera review of the school district records "with an eye toward the type of material that . . . might be most material and most likely to lead to relevant or material discovery at this stage in the proceedings." The court determined that nothing in those records was "appropriate for release at this time and responds to those concerns raised by the Defense or those assertions that they believe most likely to be necessary to the defense of the case." Accordingly, the court did not

15

release the records but kept them "in the court file sealed for further consideration without prejudice, if necessary, when the case does reach a trial department if that is the ultimate landing place for this case. If there may be other issues that arise throughout the course of the proceedings, perhaps the materials can be reconsidered by a trial judge."

Diaz did not renew his request for production in the trial court.

On appeal, Diaz asks us to review the sealed records in camera to assess whether the court erred in withholding them. Diaz asserts generically that I.'s school records "would have been important to the defense case" because "[m]uch of the evidence from [I.] revolved around what she did and did not disclose to school counselors. Any conflicting accounts [I.] gave to school counselors or staff, as well as any history of other false allegations, would certainly have been relevant to the accuracy and reliability of her testimony."

Preliminarily, we note that Diaz's argument muddies the record. The alleged illegal conduct occurred when I. was in elementary school. I. reported the conduct to a school counselor when she was in middle school. In the defense motion to release documents produced pursuant to the defense subpoenas, Diaz asserted a series of conclusory arguments as to the potential relevance of school records at all levels, none of which were tailored to a specific school district. Although I.'s decision to report the conduct to a middle school counselor was discussed at trial, neither side called school personnel as witnesses and neither side referred to any of the disclosed school records. There is nothing in the full trial record, including the pretrial defense motion, to suggest that I.'s activity in high school was relevant to her middle school disclosure of conduct occurring when she was in elementary school.[9]

_____

[9] Like all exhibits, the sealed records reviewed by a trial court are deemed part of the normal record on appeal. (Cal. Rules of Court, rules 8.320(e), 8.224.) The clerk of the superior court submitted a clerk's certificate stating that it nonetheless has not retained any exhibits for this case. The trial court's loss of the subpoenaed documents does not factor in our conclusion on the merits: were it necessary, we would direct the

16

More importantly, Diaz forfeited his challenge to the court's pretrial failure to disclose the high school records by failing to renew the request in the trial court or press for a final ruling on a pretrial order that was explicitly issued without prejudice. (See *People v. Holloway* (2004) 33 Cal.4th 96, 133.) Accordingly, we have no cause to independently review the subpoenaed documents.

### III.    DISPOSITION

The judgment is affirmed.

---

trial court to order anew the (re)production of the documents or to otherwise provide a record of its review. (See Cal. Rules of Court, rule 8.155(a)(1).) We remind the trial court that preserving the documents in accessible form or, alternatively, a detailed record of its in camera review, is less burdensome than correction of the record after the fact. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225-1230 [trial court ruling on *Pitchess* motion should make record of what documents it examined].)

17

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Diaz*
H048594